## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MELISSA DOUGLAS, THOMAS AIKINS, AND SARA KAHL, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| | )     **Case No. 20-cv-11740-DJC** |
| EF EDUCATION FIRST INTERNATIONAL, LTD., EF INSTITUTE FOR CULTURAL EXCHANGE, INC., AND EF EXPLORE AMERICA, INC., | ) ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **September 22, 2021**

## I.      Introduction

Plaintiffs Melissa Douglas ("Douglas"), Thomas Aikins ("Aikins") and Sarah Kahl ("Kahl"), on behalf of themselves and a purported class (collectively, "Plaintiffs") have filed this lawsuit against Defendants EF Education First International, Ltd. ("EF International"), EF Institute for Cultural Exchange, Inc. ("EF ICE"), and EF Explore America Inc. ("EF Explore") (collectively, "Defendants" or "EF Entities") alleging violations of Mass. Gen. L. c. 93A.  D. 60. Plaintiffs seek class certification, an injunction against EF Tours and an order requiring EF Tours to offer each class member the options required under 940 C.M.R. § 15.06 and a full or partial refund pursuant to 940 C.M.R. §§ 15.06(1) and (3).  Id. at 16-17.  Defendants have moved to dismiss.  D. 75.  For the reasons stated below, the Court DENIES the motion.

1

II.     **Standard of Review**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the conduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).  In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).  If the complaint, based on the well-pleaded factual allegations, fails to allege "content that allows the court to draw the reasonable inference that the defendant is liable" based on a legally viable claim, it is subject to dismissal.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

III.    **Factual Background**

The following summary is based upon the allegations in the second amended complaint, D. 60, and are accepted as true for the purposes of the resolving the motion to dismiss.  EF Education First is a global education company that provides language, academic, cultural exchange and educational travel programs.  D. 60 ¶ 10.  It consists of three affiliated entities—EF International, EF ICE and EF Explore America.  Id. ¶¶ 7-9, 10.  EF International is a Swiss corporation that operates tours abroad.  Id. ¶ 7.  EF Explore America and EF ICE are both based in the United States, id. ¶¶ 8-9, and market and sell travel services and tours on behalf of EF

Education First.  Id. ¶ 11.  According to EF ICE's Booking Conditions, EF International operates the EF ICE tours, while EF ICE acts as a marketing service provider for EF International.  Id. ¶ 16.

### A.    The Douglas Family

In October 2018, Douglas's daughter, Brinley Douglas ("Brinley"), attended a meeting in Henderson, Nevada, conducted by one of Brinley's high school French teachers.  Id. ¶ 34.  Brinley later decided to book one of the EF ICE tours, scheduled from April 4 to April 12, 2020, of Venice, the Alps and Paris.  Id. ¶ 36.  Douglas enrolled Brinley in the designated tour by paying a $95 non-refundable deposit via EF Tour's website and subsequently paid EF Tours the balance of the tour's full cost of $3,846 via the tour's payment plan.  Id.  On March 3, 2020, EF Tours cancelled Brinley's trip via a group email.  Id. ¶ 37.  The email stated that the tour would be rescheduled until spring 2021, which would be after Brinley's high school graduation.  Id.  Douglas spoke with EF ICE customer service on March 4, 2020 and was told she could pursue one of three options: (1) cancel Brinley's tour and receive a refund of $1,806 of the $3,846 she had paid; (2) accept a travel voucher for the cost of the tour (less the non-refundable deposit) to be used on another trip; or (3) sell the voucher to another student participating in the postponed 2021 tour.  Id. ¶ 38.  On March 5, Douglas wrote to EF ICE requesting a full refund.  Id. ¶ 39.  On March 10, 2020, EF refused Douglas's request and instead offered her a voucher for future travel, less the non-refundable deposit.  Id.  On March 17, 2020, EF ICE adjusted the offer, proposing a refund less $1,000.  Id.  On June 4, 2020, after Douglas had engaged counsel, EF ICE sent Douglas a partial refund—the amount she paid, less $565.[1]  Id.

---

[1] On May 20, 2020, the Massachusetts Attorney General issued an Assurance of Discontinuance agreement ("AOD") with EF Institute and EF America, in which EF Entities were released from any claims the Attorney General could have asserted against them.  Id. ¶ 33.  The AOD did not pursue claims under 940 C.M.R. § 15.06 because all Massachusetts residents would be offered cash refunds, less $565 for international travel and $450 for domestic U.S. travel tours.  D. 76-3 ¶¶ 12-13.

B.     **The Aikins Family**

In September 2019, Pappasorn Aikins ("Pappasorn") heard about the opportunity to take an educational tour of Italy offered through EF ICE, id. ¶ 40, and booked a tour scheduled for April 18, 2020, id. ¶ 42.  Her father, Aikins, enrolled her in the tour by paying the $95 non-refundable deposit via EF ICE's website.  Id.  Pappasorn made monthly payments until the third week of March when Aikins used his credit card to pay the balance of the tour's cost.  Id. ¶ 44.  On or about February 27, 2020, EF Tours cancelled Pappasorn's trip.  Id. ¶ 45.  Three alternative options were provided post-cancellation:  (1) students could take an alternative trip to Greece; (2) they could postpone their plans until the summer of 2020; or (3) they could accept a travel voucher from EF Tours in the amount they paid for the Italy trip that could be used for future travel.  Id. ¶ 46.  Aikins sought a refund of the purchase price of the tour when he contacted EF ICE soon after a March 4, 2020 meeting with the tour leader.  Id. ¶ 48.  In response, EF ICE offered vouchers for alternative trips.  Id.  As conditions worsened internationally due to the COVID-19 pandemic, EF ICE solely offered students vouchers.  Id. ¶ 48.

EF ICE later offered Aikins and Pappasorn three options:  (1) "cancel" the tour and receive a refund of the amount paid, less $1,000; (2) accept a travel voucher for the cost of the tour (less the non-refundable deposit) to be used on another trip; or (3) accept the travel voucher and try to sell it to another student participating in a tour.  Id. ¶ 49.  Aikins contacted the Maine Attorney General's consumer protection division to file a formal complaint against EF ICE, which remains pending.  Id. ¶ 50.  Over the next few weeks, EF ICE modified its offer, eventually agreeing to refund all but $565 of the money paid for the trip.  Id. ¶ 51.

4

C.      **The Kahl Family**

On April 25, 2019, Kahl and her two children, Madeline and Zackery, attended a virtual meeting hosted by Jodi Goodman ("Goodman"), a Group Leader for EF Tours and teacher at Madeline and Zachary's school.  Id. ¶ 52.  Goodman gave a presentation on an EF Tours' trip to Washington, D.C. and New York, scheduled for spring 2020.  Id. ¶ 52.  Shortly after the meeting, Kahl registered her children for the trip and paid EF Tours for both trips, in full, on or about April 25, 2019.  Id. ¶ 54.  On March 1, 2020, Kahl contacted EF Explore America to ask about the status of the trip and potential cancellation given COVID-19 developments.  Id. ¶ 56.  The company responded that it was monitoring the situation, but that domestic tours had not been changed.  Id. On March 10, 2020, Goodman sent an email to families, including a message from an EF Explore America Tour Consultant, explaining next steps if the tour was cancelled.  Id. ¶ 57.  On March 12, 2020, Kahl and other families received an email notifying them that the trip had been formally cancelled, id. ¶ 58, and the next day, Kahl received an email from EF Explore America, explaining that the trip would be "postponed."  Id.

On March 17, 2020, Kahl received another email from EF Explore America, offering a travel voucher for the amount paid to be used towards a different trip or exchanged for a refund of the amount paid, less $750.  Id.  ¶ 59.  The email stated that the retained $750 would partially cover costs related to non-recoverable payments to suppliers, staff and "the investment we have always made and continue to make in itinerary, date and destination flexibility."  Id. ¶ 59.  On March 19, Kahl received an email from Goodman, advising Kahl to reschedule the DC/NY trip to September 2020, id. ¶ 60, and on March 22, Kahl contacted EF Explore America requesting a full refund and an itemized list of costs EF Explore America had incurred to justify withholding $750, id. ¶ 61.  In response, on March 25, 2020, EF Explore America denied Kahl's request for a full refund and did

not provide the itemized list.  Id.  On June 5, 2020, EF Explore America issued refunds to the

Kahls, once they retained counsel, in the amount of $1,828 for each trip, less $450 each.  Id. ¶ 62.

## IV.    Procedural History

The original lead plaintiff instituted this action in the District Court for the Southern

District of California.  See D. 1.  In September 2020, the case was transferred to this Court.  D. 40;

D. 41.  Plaintiffs filed their second amended complaint on December 7, 2020.  D. 60.  Defendants

now have moved to dismiss.  D. 75.  The Court heard the parties on the pending motion and took

the matter under advisement.  D. 88.

## V.    Discussion

### A.    The Airline Deregulation Act

Plaintiffs allege that EF Entities violated Chapter 93A, which prohibits "[u]nfair methods

of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Mass Gen L. c. 93A § 2; D. 60 ¶ 78.  Plaintiffs claim EF Entities violated 940 C.M.R. § 15.06,

which they argue constitutes a *per se* violation of Chapter 93A, and that their actions were "unfair

and deceptive," thereby violating the statute.  Id. ¶ 78.  As an initial matter, EF Entities argues that

Plaintiffs' Chapter 93A claims are preempted by the Airline Deregulation Act, 49 U.S.C. § 41713,

et seq. (the "Deregulation Act").  D. 76 at 15-16.

#### 1.    Preemption

The Deregulation Act states that no state or political subdivision thereof may "enact or

enforce a law, regulation, or other provision having the force and effect of law related to a price,

route, or service of an air carrier that may provide air transportation."  49 U.S.C. § 41713(b)(1).

The Deregulation Act was enacted "to ensure that the States would not undo federal deregulation

with regulation of their own."  Morales v. TWA, 504 U.S. 374, 378 (1992).  Under the

Deregulation Act, an "air carrier" is defined as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."  49 U.S.C. § 40102(a)(2).

EF Entities claim that they are "indirect air carriers" because they are sellers of travel services, which include air travel, D. 76 at 16, and their Booking Conditions cover air travel, id. Plaintiffs argue that EF International is not an air carrier, pursuant to 49 U.S.C. § 40102(a)(2), because it is not a "citizen of the United States," but rather, is a Swiss citizen, D. 80 at 14.  A foreign air carrier may also be entitled to preemption, but must be a "a person, not a citizen of the United States, undertaking by any means, directly or indirectly, to provide foreign air transportation."  49 U.S.C. § 40102(a)(21).  "Foreign air transportation" is the "transportation of passengers . . . between a place in the United States and a place outside the United States."  49 U.S.C. § 40102(a)(23).  EF International solely operates tours abroad.  D. 76 at 2; D. 77-1 at 2. Accordingly, EF International does not qualify as a "foreign air carrier" under 49 U.S.C. § 40102(a)(21).  EF ICE and EF Explore America, however, are United States citizens.  D. 60 ¶¶ 8-9.  EF ICE and EF Explore America are affiliates and subsidiaries of EF Education First and both market and sell travel services on behalf of EF Education First.  Id. ¶ 11; see ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1299 (S.D. Fl. 2008) (stating that "[t]ravel agents, tour operations, shipping and charterers and the like are 'indirect air carriers' covered by the [Airline Deregulation Act]").  As EF ICE and EF Explore America market and sell travel services, booking air transportation as part of its tour packages, they qualify under the ADA's definition of indirect air carriers.  See Hebert v. Vantage Travel Serv., Inc., 444 F. Supp. 3d 233, 249 (D. Mass. 2020) (concluding defendant, "as a tour operator that booked air transportation as part of its tour packages" qualified as an indirect air carrier under the Airline Deregulation Act); Arkin v. Trans Int'l Airlines, Inc., 568 F. Supp. 11, 13 (E.D.N.Y. 1982) (noting that under the Federal Aviation

Act, 49 U.S.C. § 1374, "travel agents, tour operators, and nominal 'social clubs' which in fact publicly sell tours and air transportation are 'indirect air carriers'").

Turning to whether the claims brought pursuant to Chapter 93A "relate[ ] to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1), the Court notes that the Supreme Court referenced the "sweeping nature" of the Deregulation Act's preemption provision, emphasizing the reach of the provision's "relationship" language, Morales, 504 U.S. at 384, and held that the provision should be construed broadly, id. at 384-85.  See Am. Airlines v. Wolens, 513 U.S. 219, 226 (1995) (holding that claims brought under Illinois's Consumer Fraud Act that challenged an airline's "charges in the form of mileage credits for free tickets and upgrades" and "access to flights and class-of-service upgrades unlimited by retrospectively applied capacity controls and blackout dates" were sufficiently related to the rates and services of the airline to be preempted by the Deregulation Act); see McLaughlin v. TWA Getaway Vacations, 979 F. Supp. 174, 175 (S.D.N.Y. 1997) (analyzing preemption pursuant to the Deregulation Act and stating that "[t]he Supreme Court has broadly interpreted the provisions of the [Deregulation Act] to preempt all actions that are (a) asserted against air carriers and (b) have a connection with or reference to airline rates, routes, or services") (internal quotation marks omitted)).  "[U]nder Morales, the ADA preempts both laws that explicitly refer to an airline's prices and those that have a significant effect upon prices."  Buck v. Am. Airlines, Inc., 476 F.3d 29, 34 (1st Cir. 2007) (citing United Parcel Serv., Inc. v. Flores–Galarza, 318 F.3d 323, 335 (1st Cir. 2003)).  A state law claim may be preempted if it involves the enactment or enforcement of a state law that "has a connection with or relation to airline prices, routes or services even indirectly."  ABC Charters, Inc., 591 F. Supp. 2d at 1299.  "A sufficient nexus exists if the law expressly references the air carrier's prices, routes

or services, or has a 'forbidden significant effect' upon the same." United Parcel Serv., Inc., 318 F.3d at 335 (quoting Morales, 504 U.S. at 388).

According to EF Entities' Booking Conditions, EF Entities' program price includes "[r]ound-trip airfare," as well as "[a]irport transfers and transportation between destination cities." D. 77-1 at 2. EF Entities argue that "[p]rice is explicitly incorporated" into the relevant definitions and options provided in 940 C.M.R. § 15.06, upon which Plaintiffs' claims rely, D. 76 at 17, and further that the travel refunds at issue here inherently implicate price for preemption purposes, id. Preemption requires, however, that the regulation has a "direct connection to air carrier prices." DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 87-88 (1st Cir. 2011). Section 15.06 does not expressly reference air carrier prices, routes or services, referring to the value of purchased "travel service[s]" more broadly, 940 C.M.R. § 15.06; see, e.g., Chapman v. Priceline Grp., Inc., No. 3:15-cv-1519(RNC), 2017 WL 4366716, at *2 (D. Conn. Sept. 30, 2017) (noting that while "[b]roadly speaking, plaintiff's state law claims do involve prices at which [ ] [a]irlines tickets are sold . . . this does not, by itself, support ADA preemption" as defendants "must show that enforcing the state laws on which plaintiff relies would have a significant effect on the 'price, route or service of an air carrier'").

In DiFiore, 646 F.3d at 88, the First Circuit concluded that the state tips law at issue "directly regulate[d] how an airline service is performed and how its price is displayed to customers," and therefore had "a direct connection to air carrier prices and services and [could] fairly be said to regulate both." Id. The court emphasized that the law did "more than simply regulate the employment relationship between the skycaps and the airline," but rather, had "the same potential impact on [the airline's] practices as a guideline condemning the same conduct explicitly." Id. The airline would need to consider such modifications as "[m]odifying the

[defendants'] website to mention tips," "[p]ermitting credit-card payments," "[i]nstalling a cash register at the curbside," and "[r]e-bundling the cost of curbside check-in into ticket prices," to comply with the state law.  Id.  The court concluded that such suggestions "could easily affect price and not just the provision of the [airline's] service."  Id. at 89.  Similarly, in United Parcel Serv., Inc. v. Flores–Galarza, 318 F.3d at 336, the First Circuit concluded that the challenged scheme had a "significant effect" on UPS's prices, routes or services where it forbade delivery unless a recipient produced a certificate, which "significantly affect[ed] the timeliness and effectiveness of UPS's service" and "create[d] a substantial burden on UPS, in the form of additional labor, costs, and delays."  Id.  The court emphasized that the burden "directly and significantly affect[ed] UPS's routes and services, which depend upon an orderly flow of packages."  Id.

Here, Plaintiffs' claim, which pertains to EF Entities' failure to offer Plaintiffs the required refund options when their tours were cancelled, unlike DiFiore or United Parcel Serv., Inc., has no clear tie or relation to the price, route or service of an air carrier nor does it have an apparent impact thereon.  EF Entities has failed to allege any comparable or otherwise significant impact on its prices, routes or services stemming from the enforcement of 940 C.M.R. § 15.06.  It is unclear how providing the refund options required by 940 C.M.R. § 15.06 would alter EF Entities' price, route or service, particularly where refunds are already provided in some form by the company, D. 76 at 6.

The cases cited by EF Entities do not compel a different outcome.  In Buck, 476 F.3d at 29, plaintiffs purchased nonrefundable, unused airline tickets from American Airlines and sought to recover various fees and taxes that had been collected as part of the original ticket price.  Buck, 476 F.3d at 35.  In ABC Charters, Inc., 318 F.3d at 336, the offending state law submitted

companies providing lawful travel related services to Cuba to, among other things, "extraordinary expensive registration and bonding requirements [and] exorbitant fines." Id.   The court in ABC Charters, Inc. concluded that the law "'related to' (and [would] certainly affect) the routes, prices or services Plaintiffs provide" as "[f]ewer services at a higher rate [would] be the inevitable (and intended) result of the [law] as the number of travel agencies shrink, because they cannot afford to post a $100,00.00 to $250,000.00 bond, or as their increased costs are passed on to their customers." Id. at 1301.  Both cases clearly "relate to" the price or service provided by a direct or indirect air carrier, and neither involve a claim, as in the present case, unrelated to price, route or service, nonetheless being preempted by the courts because air transportation was an element of the travel package at issue.  The plaintiffs in ABC Charters, Inc. were travel agents, who sold airline tickets, and aircraft charterers, who filed suit due to the state law's direct effect on air transportation prices, id., and the plaintiffs in Buck filed suit seeking "refunds of government fees associated with air travel," Buck, 476 F.3d at 36.  Such cases are dissimilar from the claim at hand, in which Plaintiffs purchased tour packages, that in some cases included airline travel, and filed suit to obtain a refund or other alternative, pursuant to 940 C.M.R. § 15.06, when those tours did not occur.  D. 60 ¶¶ 78-79; DiFiore, 646 F.3d at 88 (noting that "federal preemption does not reach state laws that have only a 'tenuous, remote, or peripheral' impact" on air carrier prices, routes or services (quoting Rowe v. New Hampshire Motor Transport Ass'n, 552 U.S. 364, 371 (2008)).  Accordingly, the Court concludes that the Deregulation Act does not preempt Chapter 93A as it relates to the claim brought by Plaintiffs here.

2.    *Plausible Allegations for Plaintiffs' Chapter 93A Claim*

"Chapter 93A . . . is a broad consumer protection statute that provides a private cause of action for a consumer who 'has been injured,' by 'unfair or deceptive acts or practices in the

conduct of any trade or commerce.'" Shaulis v. Nordstrom, Inc., 865 F.3d 1, 6 (1st Cir. 2017) (quoting Mass. Gen. L. c. 93A §§ 9(1), 2(a)) (internal citations omitted). Although Chapter 93A "does not define what acts and practices are unfair or deceptive, § 2(c) of [Chapter] 93A specifically authorizes the Attorney General to promulgate regulations making these determinations." Casavant v. Norwegian Cruise Line, Ltd., 76 Mass. App. Ct. 73, 76 (2009), aff'd, 460 Mass. 500 (2011); see McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 116 (1st Cir. 2014).

Plaintiffs allege that, after EF Entities cancelled the scheduled trips, they failed to offer Plaintiffs their choice of alternatives enumerated under 940 C.M.R. § 15.06 and instead referred Plaintiffs to contract provisions that stated customers would receive a future travel voucher, less non-refundable fees. D. 60 ¶ 64. Where, as here, regulations set out that an act or practice is *per se* unfair or deceptive, see 940 C.M.R. § 15.01(1) (recognizing that a "[v]iolation of any provision of 940 C.M.R. § 15.00 shall be an unfair or deceptive act or practice"), a plaintiff still must satisfy other elements of the Chapter 93A claim (e.g., causation and injury), see Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013) (concluding that "violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself"); Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 478 (D. Mass. 2015) (noting that plaintiff must prove regulatory violation plus injury caused by the unfair or deceptive act); Barron v. NCMIC Ins. Co., No. 17-cv-11969-ADB, 2018 WL 2089357, at *5 (D. Mass. May 4, 2018) (explaining that "[v]iolations of state regulations that constitute *per se* unfair or deceptive practices under Chapter 93A do not, without more, establish injury under Chapter 93A"). As to the first element of the c. 93A claim, however, when regulations establish *per se* unfair or deceptive acts or practices, plaintiffs need not make an additional showing

of unfairness or deceptiveness aside from evidence of the violation itself.  See Cranmore v. Wells Fargo Bank, N.A., 410 F. Supp. 3d 336, 341–42 (D. Mass. 2019) (concluding that violation of 209 C.M.R. § 18.22(1) "is *per se* 'an unfair or deceptive act or practice' under Chapter 93A" and rejecting defendants' argument that a Chapter 93A claim requires more than an allegation that action violated regulation, which "explicitly defines a violation of [the regulation] as *per se* 'an unfair or deceptive act or practice' under Chapter 93A").  The SJC has held that "the [A]ttorney [G]eneral may make rules and regulations interpreting the provisions of [Chapter 93A]," like 940 C.M.R. § 15.00, that "define[] and outlaw[] certain unfair or deceptive business practices in the sale of travel services to the public . . . ."  Casavant, 460 Mass. at 503–04.  Thus, when regulations define such acts or practices, evidence showing "violations [of the Attorney General's Regulations] qualify as unfair or deceptive acts" as a matter of law.  Id. at 504 (reversing trial judge's conclusion that no Chapter 93A violation occurred when evidence at trial showed regulatory violation and remanding for determination of damages); see Hebert v. Vantage Travel Service, Inc., No. 17-cv-10922-DJC, 2021 WL 2516076, at *3 (D. Mass. June 18, 2021) (discussing and distinguishing Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 174 (2013) and McDermott, 775 F.3d at 120-22 and concluding that although both barred "*per se* Chapter 93 liability," neither addressed "whether regulations could define acts or practices as *per se* unfair or deceptive" as 940 C.M.R. §15.06 does).

Here, section 15.06 requires that, where "a seller of travel services is acting as a tour operator, and the seller fails to provide any of the travel services that a consumer has purchased directly or indirectly," the seller must offer the consumer their choice of (1) "cash an amount equal to the fair market retail value of any undelivered, purchased travel service," (2) "specially identified substitution travel service of equal or greater fair market retail value for any undelivered,

purchased travel service" or (3) "specially identified substitute travel service of lower fair market retail value for any undelivered, purchased travel service, and refund to the consumer in cash an amount equal to the difference in the fair market retail prices of the purchased and the substitute travel services." 940 C.M.R. § 15.06. Under the regulations, "tour operator" is defined as "a seller of travel services that creates and sells travel packages, either directly to the public or indirectly to the public." 940 C.M.R. § 15.02. Thus, the regulation is applicable to EF Entities as the tour operator of tour packages purchased by Plaintiffs. EF Entities also admit that they are sellers of travel services and tour operators. See D. 76 at 16.

Accordingly, "[t]he proper inquiry," is "whether [EF Entities] violated the Attorney General's regulations," which required EF Entities to offer Plaintiffs a full cash refund, a substitute trip of equivalent value or a substitute trip of lesser value with a cash refund of the difference. Casavant, 76 Mass. App. Ct. at 77; see 940 C.M.R. § 15.06. Plaintiffs allege that Defendants failed to do so. The scope of 940 C.M.R. § 15.06 remains "bound by the strictures of Chapter 93A, including the requirements of showing unfair and deceptive conduct occurring in trade or commerce," McDermott, 775 F.3d at 121, and Plaintiffs must still show that they suffered an injury as a result to prevail, Ferreira, 130 F. Supp. 3d at 478. At this stage, however, Plaintiffs' claim that Defendants failed to offer the choice of a full refund for undelivered travel services is adequately pled including as to a plausibly alleged first element of their claim, namely an unfair or deceptive act. See Casavant, 460 Mass. at 504. EF Entities' argument that the refunds already offered to Plaintiffs preclude a finding that they engaged in "unfair or deceptive acts," D. 85 at 6,

14

ignores the plain language of the Attorney General's regulations, where violation of any regulation within the section "shall be an unfair or deceptive act or practice."  940 C.M.R. § 15.01(1).

Accordingly, the Court denies the motion to dismiss.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss, D. 75.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

15