**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **MELISSA DOUGLAS, THOMAS AIKINS,** and **SARA KAHL, on behalf of themselves and all others similarly situated,**<br><br>         **Plaintiffs,**<br><br>         **v.**<br><br>**EF INSTITUTE FOR CULTURAL EXCHANGE, INC., EF EDUCATION FIRST INTERNATIONAL, LTD., and EF EXPLORE AMERICA, INC.,**<br><br>         **Defendants.** | **Case No. 20-cv-11740-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                           **June 20, 2024**

## I.      Introduction

Plaintiffs Melissa Douglas, Thomas Aikins and Sarah Kahl, on behalf of themselves and a putative class (collectively, "Plaintiffs"), have filed this lawsuit against Defendants EF Institute for Cultural Exchange, Inc. ("EF ICE"), EF Education First International, Ltd. ("EF International") and EF Explore America, Inc. ("EF America") (collectively, "EF Tours"), alleging violations of Mass. Gen. L. c. 93A ("Chapter 93A").  D. 60.  Plaintiffs now move for class certification under Fed. R. Civ. P. 23.  D. 351.  For the reasons stated below, the Court DENIES the motion.

## II.      Standard of Review

A class action may be certified only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims

1

or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  The Court must also determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"[T]he district court must undertake a 'rigorous analysis' to determine whether plaintiffs me[e]t the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites."  In re Nexium Antitrust Litig., 777 F.3d 9, 17 (1st Cir. 2015) (internal citations omitted); see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003).  Plaintiffs bear the burden of proving that class certification is justified.  Makuc v. Am. Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 1987).  When "plaintiffs have made their initial showing, defendants have the burden of producing sufficient evidence to rebut the plaintiff's showing."  Nexium, 777 F.3d at 27.  "[D]istrict courts have broad discretion to grant or deny class certification."  McCuin v. Sec'y of Health & Hum. Servs., 817 F.2d 161, 167 (1st Cir. 1987).

## III.   Factual Background

The following relevant facts are drawn from the parties' submissions in support of and in opposition to Plaintiffs' motion for class certification.

Plaintiffs Melissa Douglas, Thomas Aikins and Sarah Kahl enrolled their children in tours operated by EF Tours scheduled to depart in the spring of 2020.  D. 352-1 ¶ 2; D. 352-2 at 1, 3–4, 6, 8, 10.  On or after January 30, 2020, more than 283,000 students were scheduled to depart on

tours between March 2020 and December 2021.  D. 360-4 at 4–5.  As Covid-19 spread across the globe, however, tours were either canceled, rescheduled or postponed.  D. 360-5 at 6.

A.   **EF Tours Arranges Tours for Students**

EF Tours arranges and operates educational group tours domestically and abroad, predominantly for students in high school and middle school.  D. 361-2 at 3–4; D. 361-3 at 3.  EF International operates tours abroad, which are marketed by EF ICE, D. 361-1 ¶ 20; D. 361-16 at 2; EF America operates tours domestically and elsewhere in North America.  D. 361-3 at 3.

EF Tours facilitates its tours by securing travel services in bulk from airlines, hotels and other vendors, consolidating these services into educational group tours, and then marketing tours to schools and teachers.  See D. 361-6 at 3; D. 361-51 ¶ 3.  If a teacher is interested in taking students on a tour, he or she assumes the role of "Group Leader," works with EF Tours to plan itineraries and recruits students to join his or her group.  D. 361-2 at 6; D. 361-51 ¶ 4; see D. 361-10 at 3.  Group Leaders keep students and parents informed in the lead-up to the tours, which they eventually lead.  See D. 361-51 ¶ 4.  A student's participation in the tour may be paid for directly by the student's parents but also through scholarships or fundraising.  See D. 361-2 at 17–18.

To enroll their child on a tour, parents were required to agree to certain "Booking Conditions."  D. 361-51 ¶ 6.  Booking Conditions for the tours included *force majeure* clauses; for example, Booking Conditions for EF International's tours provided that EF Tours "retains the right to cancel, modify, or delay the tour as a result of unforeseeable events that are beyond EF's reasonable control, including but not limited to . . . public health issues or quarantine or threats of public health issues."  D. 352-4 at 5; D. 361-16 at 4; see D. 352-3 at 6 (EF America's policy stating that "EF may cancel any tour for Extraordinary Events" which is defined to include "public health issues").  The *force majeure* clause further provided that "[i]f EF cancels the tour for any such

reason, travelers will receive an EF future travel voucher for all monies paid, less the $95 non-refundable deposit and any additional non-refundable fees." D. 352-4 at 5; D. 361-16 at 4; <u>see</u> D. 352-3 at 6.  The Booking Conditions also contained provisions purporting to release EF Tours of liability for "any and all claims of any nature related in any manner to my participation in an EF-sponsored tour or a Service Learning Tour, including, but not limited to, claims for negligence, breach of contract, breach of express or implied warranties, negligence or wrongful death, or any statutorily based claim." D. 352-3 at 8; D. 352-4 at 8; D. 361-16 at 7.

Booking Conditions also provided, in relevant part, "I have made the choice to travel with the teacher/Group Leader organizing my group.  I understand that this choice is not the responsibility of EF [and] understand that my Group Leader is able to make decisions on my behalf, including but not limited to changing the group's requested tour or travel date." D. 352-3 at 8; D. 352-4 at 8; D. 361-16 at 7.

### B. Tours Are Postponed or Canceled in the Midst of the Covid-19 Pandemic

In January 2020, as Covid-19 was spreading in China, EF Tours emailed travelers stating that the company was following the guidance of the U.S. Department of State and the U.S. Centers for Disease Control and Prevention ("CDC") and that it would work with customers slated to travel to China to make changes to their itineraries. D. 361-1 ¶ 24; D. 361-20 at 2.  EF Tours also noted that it would "remain in contact with your Group Leader, and will inform them of any changes needed to your group's travel plans by the end of February." D. 361-20 at 2.  On February 27, 2020, EF Tours emailed travelers to inform them that groups scheduled to travel in northern Italy had been rerouted due to a concentration of cases in that region and that EF Tours was continuing to follow guidance from the U.S. Department of State, the CDC and the World Health Organization. D. 361-1 ¶ 25; D. 361-21 at 2.

On March 12, 2020, after the U.S. Department of State issued a global travel alert advising U.S. citizens to reconsider travel abroad due to the global impact of Covid-19, EF Tours notified travelers that international groups scheduled to depart in March and April 2020 would be postponed.  D. 360-1 ¶ 26; D. 361-22 at 2.  The next day, EF America postponed tours in the United States, Canada and Puerto Rico through April 30, 2020.  D. 361-1 ¶ 27; D. 361-23 at 2.  EF Tours continued monitoring pandemic-related restrictions and, on April 1, 2020, updated travelers that tours scheduled through the end of May would be postponed but that decisions had not yet been made for tours scheduled to depart on or after June 1, 2020.  D. 361-1 ¶ 30; D. 361-26 at 2.  EF Tours ultimately postponed tours through the remainder of 2020 and into 2021.  D. 361-1 ¶ 31; D. 361-2 at 8; D. 361-27 at 2.

Meanwhile, during 2020 and 2021, many travelers canceled their enrollments in group tours, either directly or through their Group Leaders; in some instances, school districts canceled the tours.  D. 361-2 at 21; D. 361-10 at 10, 12–13; D. 361-51 ¶¶ 15–18.  Cancellations often occurred over the phone or via email.  See D. 361-51 ¶¶ 15–17, 19.  Some of these cancellations were made prior to March 12, 2020, when EF Tours postponed international group tours, and for reasons unrelated to the pandemic.  See, e.g., id. ¶ 18.  EF Tours logged communications surrounding these cancellations in "comms logs."  Id. ¶¶ 8–9.

In or around March 2020, EF Tours began offering three options to travelers who canceled trips, including a rescheduled trip, a future travel voucher for all amounts paid or a cash refund, less non-refundable fees.  See D. 352-1 ¶ 5; D. 352-5 at 8, 14; D. 361-1 ¶ 28; D. 361-10 at 14–15; D. 361-24 at 2.  Depending on the trip, non-refundable fees initially were $750 or $1,000 and then eventually were reduced to $350.  See D. 352-18 ¶¶ 28–29; D. 361-3 at 15–16; D. 361-10 at 14–15, 17.

## IV.    Procedural History

On March 17, 2020, the original lead plaintiff filed this lawsuit in the U.S. District Court for the Southern District of California.  D. 1.  On May 15, 2020, Douglas and other plaintiffs filed the first amended complaint.  D. 12.  In September 2020, the case was transferred to this Court. D. 40; D. 41.  Plaintiffs filed the operative, second amended complaint ("SAC") on December 7, 2020.  D. 60.

On February 5, 2021, EF Tours moved to dismiss the SAC under Fed. R. Civ. P. 12(b)(6), D. 75, and the Court denied the motion.  D. 94.  On November 10, 2021, EF Tours moved to certify questions regarding 940 C.M.R. § 15.06 ("§ 15.06") to the Massachusetts Supreme Judicial Court.[1]  D. 108.  The Court denied the motion.  D. 147.  On December 15, 2021, Plaintiffs moved for leave to file a proposed third amended complaint ("PTAC"), D. 121, seeking to add allegations claiming violations of 940 C.M.R. §§ 15.03 and 15.04.  See id. at 1; D. 121-1 ¶¶ 29, 30–32, 39– 40, 91, 98.  Plaintiffs further sought to amend the class definition from individuals "who purchased travel services from EF Tours . . . for whom EF Tours failed to provide the purchased travel services" and "for whom EF Tours have not offered the option of electing a full cash refund of the amount they paid for the undelivered travel services," D. 60 ¶ 70, to individuals who "paid for EF Tours' travel services for tours to take place in 2020 or 2021," whose "tours were governed by the International Booking Conditions or the EF Explore America Booking Conditions," whose "tours

---

[1] Section 15.06 provides that, where "a seller of travel services is acting as a tour operator, and the seller fails to provide any of the travel services that a consumer has purchased directly or indirectly," the seller must offer the consumer their choice of (1) "cash an amount equal to the fair market retail value of any undelivered, purchased travel service," (2) "specifically identified substitution travel service of equal or greater fair market retail value for any undelivered, purchased travel service," or (3) "specifically identified substitute travel service of lower fair market retail value for any undelivered, purchased travel service, and refund to the consumer in cash an amount equal to the difference in the fair market retail prices of the purchased and the substitute travel services."

did not depart in 2020 and 2021," who "prior to February 27, 2020 . . .  did not provide EF Tours

with a writing cancelling their tour," and who "have not received a full refund of what they paid

for their tour."  D. 121-1 ¶ 89.  The Court denied the motion because, among other reasons, the

proposed class definition would have included many consumers who could not assert an injury

under § 15.06 and, thus, would have been overbroad.  D. 148.

On July 27, 2022, EF Tours moved to dismiss the SAC for lack of standing and to strike

class allegations.  D. 152.  The Court denied that motion.  D. 240.  Plaintiffs moved for class

certification on March 6, 2024.  D. 351.  The Court heard the parties on the pending motion on

April 24, 2024 and took the matter under advisement.  D. 367.[2]

## V.     Discussion

### A.     Class Definition

In light of the parties' disagreement as to the appropriate class definition, see D. 352 at 6–

7; D. 361 at 19–20, the Court first considers whether Plaintiffs have proposed an adequate class

definition.  Plaintiffs now moves for certification of the following class:

> All purchasers of travel services from EF for trips that were initially scheduled to
> depart between March 12, 2020 and December 31, 2021 (the "Class Period"),
> whose trips did not depart as originally scheduled, and to whom EF paid a refund
> that was less than the full amount that the purchasers initially paid for the trips (a
> "Partial Refund").  The Class excludes any employees of EF and its affiliates or
> their immediate family members, and any judge presiding over this case or their
> immediate family members.

D. 351 at 1.  This proposed class, however, differs from the class definition alleged in the SAC.

See D. 60 ¶ 70.  Notably, Plaintiffs' proposed class definition would expand the class from

---

[2] EF Tours moved for leave to file a sur-reply in advance of the motion hearing, D. 363, with a draft of the surreply attached.  D. 363-1.  The Court has allowed that motion *nunc pro tunc*, D. 370, and has considered the surreply in resolution of the pending class certification motion.

travelers "for whom EF Tours failed to provide the purchased travel services," id., to individuals "whose trips did not depart as originally scheduled."  D. 351 at 1.

Although a plaintiff need not, at class certification, propose a class definition identical to the definition alleged in the operative complaint, courts may limit the extent to which a proposed class may be modified, particularly where the expansion of same would unfairly prejudice a defendant.  For instance, some courts have held that a plaintiff may propose a new class definition as long as it is narrower than the class definition in the operative complaint.  See, e.g., Delcavo v. Tour Res. Consultants, LLC, No. 21-2137-JWL, 2022 WL 1062269, at *3 (D. Kan. Apr. 8, 2022) (noting that, consistent with cases cited by the defendant, the Court "will limit its consideration of certification to a class no broader than that alleged in the complaint"); Krikorian, on Behalf of TPS Parking Mgmt., LLC 401(k) Plan v. Great-W. Life & Annuity Ins. Co., No. 16-cv-00094-REB-SKC, 2018 WL 4360539, at *3 (D. Colo. Sept. 13, 2018) (denying expansion of the class definition where such expansion "would permit the plaintiff to assert claims on behalf of such plans even though [they] are not described in the complaint"); Lavigne v. First Cmty. Bancshares, Inc., No. 1:15-CV-00934-WJ/LF, 2018 WL 2694457, at *2 n.2 (D.N.M. June 5, 2018) (noting that "Plaintiff may amend the class definition because the new class definition is narrower than the originally proposed definition"); Tillman v. Ally Fin. Inc., No. 2:16-cv-313-FtM-99CM, 2017 WL 7194275, at *2 n.3 (M.D. Fl. Sept. 29, 2017) ("accept[ing] the revised [class] definition" where defendant "has not otherwise shown prejudice as the revised class definition is a narrower version of the original class definition, which is generally allowable"); Bouton v. Ocean Props., Ltd, 322 F.R.D. 683, 693 (S.D. Fl. 2017) (denying expansion of the class definition noting that "[a]lthough a plaintiff may seek to certify a class definition *narrower* than the one proposed in the operative pleading without a new claim for relief, the converse is not allowed") (emphasis in original);

Abdeljalil v. Gen. Elec. Cap. Corp., 306 F.R.D. 303, 306 (S.D. Cal. 2015) (denying defendant's objection to the class definition where the court "agree[d] with plaintiff that the new definition is simply a narrower version of the class definition presented in the [operative complaint]").  In declining to permit broader class definitions, courts have reasoned that doing so would be unfairly prejudicial to defendants.  See, e.g., Smith v. Seeco, Inc., No. 4:15CV00147 BSM, 2016 WL 3541412, at *3 (E.D. Ark. Mar. 11, 2016) (holding that "Plaintiffs' expanded class definition will not be permitted because such an expanded class definition at this stage in the proceedings would be unduly prejudicial to the defendants after months of discovery has been conducted and expert disclosures have been submitted"); Vincent v. Money Store, 304 F.R.D. 446, 453 (S.D.N.Y. 2015) (noting that expanding the class would be "unfair to the defendants" given, among other things, the lack of notice regarding the nature and scope of the claims asserted).  These limits reflect the principle that "class definition is a tool of case management." Abbott v. Lockheed Martin Corp., 725 F.3d 803, 810 (7th Cir. 2013).  "It settles the question who the adversaries are, and so it enables the defendant to gauge the extent of its exposure to liability and it alerts excluded parties to consider whether they need to undertake separate actions in order to protect their rights." Id.

Here, Plaintiffs' proposed class is not narrower than the class definition alleged in the SAC.  As noted, Plaintiffs seek to broaden the scope of the class to include individuals who may have canceled their group tours prior to any postponement or cancellation of same by EF Tours.  EF Tours' expert, Stephen Buffo, analyzed a random sample of the roughly 283,000 travelers scheduled for trips between March 1, 2020 and December 31, 2021.  D. 360-47 ¶ 42.  Buffo opined that between 48% and 58% of EF International travelers and between 39% and 49% of EF America travelers likely canceled their tour enrollment, either directly or through their Group Leader, before EF Tours canceled or postponed same.  D. 360-47 ¶¶ 92, 95.  These modifications, which would

add tens of thousands of plaintiffs to the class, cannot be dismissed as "minor."  See Vincent, 304 F.R.D. at 453; cf. In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 590–91 (N.D. Cal. 2010) (denying motion to strike modified class definitions where, in addition to requiring no additional discovery and causing no prejudice, the proposed modifications were "minor").

Plaintiffs' proposed class definition is also broader with respect to the alleged scope of Defendants' liability.  The class allegations in the SAC assert that "[t]he principal common issues regarding the class include:  whether EF Tours' failure to provide class members with the three options required by § 15.06 is a violation of Chapter 93A; whether their misconduct was willful or knowing; and whether their refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the acts or practices complained of violated Chapter 93A." D. 60 ¶ 73.  Consistent with these allegations, Plaintiffs have taken the position throughout this litigation that class membership is confined to travelers who did not cancel their trips prior to any postponement or cancellation of same by EF Tours.  See, e.g., D. 178 at 16 (Plaintiffs arguing in opposition to a motion to compel discovery that the "real question is whether an individual traveler or school cancelled their tour before EF decided the tour should not go forward as originally scheduled"); D. 254 at 62, 64–65 (Plaintiffs' counsel arguing for discovery "to identify who are the people who canceled early" and noting that "what we're asking for in these requests are who canceled early and who are the people that EF doesn't have any record of them canceling early" because, "with that, we will know who is in the class and who is out").

Plaintiffs now insist, however, that "who canceled first" is irrelevant because the Booking Conditions—to which all travelers or their parents agreed, D. 361-51 ¶ 6, irrespective of whether they canceled their trips—violated Chapter 93A.  Specifically, Plaintiffs assert a *per se* violation of Chapter 93A on the theory that the Booking Conditions included contractual provisions that

purported to waive travelers' rights, that such waivers violated Mass. Gen. L. c. 93, § 101 ("§ 101") (providing that "[a]ny rights granted to consumers under the provisions of any law or regulation enacted or promulgated by the commonwealth . . . providing protection of such consumers' health, safety or welfare shall not be waived by agreement or otherwise unless specifically permitted by such law or regulation") and that such violations of § 101, in turn, violated Chapter 93A. Plaintiffs' basis for claiming that § 101 violations are *per se* violations of Chapter 93A is 940 C.M.R. § 3.16(3), which provides that an act or practice violates Chapter 93A if "[i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth . . . intended to provide the consumers of this Commonwealth protection." Setting aside the merits of this theory, Plaintiffs cannot "*expand* the scope of the proposed class at the class certification stage to include . . . theories of liability that are not encompassed within the [SAC]." See Bouton, 322 F.R.D. at 693 (emphasis in original).

Plaintiffs maintain that their § 101 theory of Chapter 93A liability is not new and point to the last numbered paragraph of the SAC, citing 904 C.M.R. § 3.16 and Mass. Gen. L. c. 93, § 101. See D. 60 ¶ 79(d)–(e). There also appear to be several other references to § 101 in the SAC, see id. ¶¶ 31, 67, although there is no other reference to § 3.16. When these allegations are read in context, and the SAC is construed as a whole, however, it is plain that Plaintiffs' theory of Chapter 93A liability, as alleged in the SAC, is that EF Tours failed to provide class members full refunds under § 15.06 and that any reference to § 101 is there to allege that those with viable § 15.06 claims have not waived their rights by agreeing to the Booking Conditions. Plaintiffs Melissa Douglas and Sara Kahl's Chapter 93A demand letter, attached to the SAC, makes this point explicit. See D. 60-1 at 6–7 (asserting that, "to the extent Education First's contracts purport to waive these or other consumer rights, such a waiver is invalid under [§ 101]," and then demanding relief under

§ 15.06); see also D. 60 ¶ 66 (alleging that § 15.06 was "the legal basis for the Plaintiffs' demand for relief").  Moreover, as the Court has already noted, in the section of the SAC titled "Class Allegations," Plaintiffs exclusively assert violations of § 15.06.  D. 60 ¶¶ 70–77.  The specific allegations about each class representative also center on EF Tours' alleged cancellation of tours and subsequent refusal to provide a full cash refund.  See D. 60 ¶¶ 34–62.

Given the degree to which Plaintiffs seek to expand the class, and their assertion of a substantially broader theory of liability under Mass. Gen. L. c. 93, § 101 and 940 C.M.R. § 3.16(3), the certification of Plaintiffs' proposed class definition would be unduly prejudicial and unfair to Defendants, who for more than three years since the filing of the SAC on December 7, 2020, D. 60, have been litigating this case on the reasonable expectation that their exposure to liability under Chapter 93A has been premised on an alleged § 15.06 violation.[3]  See Rivera v. Invitation Homes, Inc., No. 18-cv-03158-JSW, 2022 WL 504161, at *4 (N.D. Cal. Feb. 18, 2022) (concluding that the allowance of plaintiff's proposed modification to the class definition would prejudice defendant given that defendant "has not had sufficient notice of this theory of liability" and "the length of time this case has been pending" when the "Plaintiff's allegations and arguments have focused [on a different theory of liability]").

---

[3] The unfairness of Plaintiffs now pressing a § 101 theory of Chapter 93A liability is compounded by the fact that this litigation has involved briefing and argument on numerous dispositive motions, D. 75; D. 152; these motions were brought by EF Tours on the reasonable expectation, based on the posture of Plaintiffs throughout this case,  that Plaintiffs were asserting a § 15.06 claim.  See D. 94 at 1 (summarizing Plaintiffs' claim as a § 15.06 claim in the denial of EF Tours' motion to dismiss); D. 240 at 1 (summarizing same in the denial of EF Tours' motion to dismiss and strike the class allegations).  Thus, allowing Plaintiffs' expanded class definition at this juncture would, for one example, have deprived EF Tours of the opportunity to seek dismissal of Plaintiffs' § 101 claim under Rule 12(b)(6) or other grounds.

In sum, because Plaintiffs propose an expanded class definition and the proposed modifications would be unfairly prejudicial to EF Tours, the Court declines to certify Plaintiffs' proposed class definition. Even if the Court had accepted Plaintiffs' class definition, it fails on the predominance requirement under Rule 23(b)(3) as discussed below. For that reason, the Court addresses all of the Rule 23(a) and 23(b)(3) factors below.[4]

### B. <u>Ascertainability</u>

Before addressing the Rule 23(a) and (b) requirements, the Court must determine if the class is ascertainable. Although not expressly mentioned in Rule 23, an implicit prerequisite to class certification is that a "class" exists—that is, it must be "administratively feasible" to determine whether a particular individual is a member. <u>Kent v. SunAmerica Life Ins. Co.</u>, 190 F.R.D. 271, 278 (D. Mass. 2000) (citing 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 1760, at 581 (2d ed. 1972)). Administrative feasibility is gauged by whether the class is "definite," <u>Nexium</u>, 777 F.3d at 19, with contours defined by "stable and objective factors." <u>Kent</u>, 190 F.R.D. at 278. Not every class member must be identified, but the class must be sufficiently ascertainable to permit a court to "decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment." <u>Id.</u> (citing <u>Crosby v. Soc. Sec. Admin. of the U.S.</u>, 796 F.2d 576, 580 (1st Cir. 1986)).

---

[4] Plaintiffs appear to take the position that the class definition alleged in the SAC cannot be certified because it is a "fail-safe" class. <u>See</u> D. 362 at 10, 22–23. A fail-safe class "is defined so that whether a person qualifies as a member depends on whether the person has a valid claim on the merits." <u>Bais Yaakov of Spring Valley v. ACT, INC.</u>, 328 F.R.D. 6, 13 (D. Mass. 2018) (citation omitted). The First Circuit has recognized "the inappropriateness of certifying what is known as a 'fail-safe class.'" <u>Nexium</u>, 777 F.3d at 22. EF Tours agrees that a narrow class, like the one initially alleged in the SAC, cannot be certified, albeit on other grounds. <u>See</u> D. 361 at 13–32. Accordingly, the Court focuses on the Plaintiffs' proposed definition of the class in its motion assuming *arguendo* that it could introduce this definition at this juncture.

A viable class definition "must have some relation to the [d]efendant['s] activities." Rowe v. E.I. Dupont De Nemours & Co., 262 F.R.D. 451, 455 (D.N.J. 2009) (quoting O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 320 (C.D. Cal. 1998)); Duffin v. Exelon Corp., No. CIV A 06 C 1382, 2007 WL 845336, at *3 (N.D. Ill. Mar. 19, 2007); Daigle v. Shell Oil Co., 133 F.R.D. 600, 602 (D. Colo. 1990). Accordingly, a class may not be ascertainable if it is overbroad. See Pagan v. Dubois, 884 F. Supp. 25, 28 (D. Mass. 1995); see also Duffin, 2007 WL 845336, at *3 (explaining that "[o]verbroad class descriptions violate the definiteness requirement because they include individuals who are without standing to maintain the action on their own behalf") (internal quotation marks and citation omitted). A class is overbroad where it is overinclusive of individuals who do not "have the legal right to bring suit against the defendant on their own." In re TJX Cos. Retail Sec. Breach Litig., 246 F.R.D. 389, 392 n.2 (D. Mass. 2007).

Assuming *arguendo* that Plaintiffs could expand the class definition and assert their broader theory of liability under Chapter 93A at this juncture without undue prejudice to EF Tours, Plaintiffs' presently proposed class appears to be at least ascertainable. The Court previously denied Plaintiffs' motion to amend the SAC to add allegations which similarly would have expanded the class to individuals who canceled their tours, D. 148; at that juncture in this litigation, however, Plaintiffs' theory of Chapter 93A liability centered around § 15.06. See D. 60 ¶¶ 28, 63–69, 73, 79; D. 148. Because § 15.06 would not apply where a traveler or his or her Group Leader canceled a tour, the proposed class in the PTAC would have included within the class many uninjured individuals and, therefore, been overbroad. D. 148 (concluding that the proposed revision of the class definition "lacks grounding in the language of § 15.06, which requires only that consumers be 'offer[ed],' as one of three options, a 'refund . . . in cash an amount equal to the fair market value of any undelivered, purchased travel service'"). Under Plaintiffs' § 101 theory

of liability, however, the class would include such individuals because, as part of the enrollment process, all travelers—regardless of whether they canceled first—were required to agree to certain "Booking Conditions," including the *force majeure* clause and the release of liability, see D. 352-3 at 6, 8; D. 352-4 at 5, 8; D. 361-16 at 4, 7; D. 361-51 ¶ 6, eliminating uninjured members (again, assuming *arguendo* the class definition can be expanded in the first instance at this juncture).

The proposed class is also defined by "stable" and "objective" criteria. See Kent, 190 F.R.D. at 278. The class is temporally bound by specific dates, i.e., "trips that were initially scheduled to depart between March 12, 2020 and December 31, 2021" and "whose trips did not depart as originally scheduled" and "to whom EF paid a refund that was less than the full amount that the purchasers initially paid for the trips." D. 351 at 1; cf. Crosby, 796 F.2d at 580 (concluding that a class was not ascertainable because it included the standard, "within a reasonable time," making it "impossible" for potential class members to determine their class membership). Moreover, the particular travelers within the proposed class are identifiable, as shown by the evidence that, on or after January 30, 2020, more than 283,000 students were scheduled to depart on tours on or after March 1, 2020 through December 31, 2021, D. 360-4 at 4–5, and did not depart as scheduled.

### C.   Rule 23(a) Requirements

#### 1.   *Numerosity*

Turning to the Rule 23(a) requirements, the Court first considers whether "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required . . . but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d

220, 226–27 (3d Cir. 2001)).  Plaintiffs assert that the class includes "well over 100,000 persons." D. 352 at 10.  EF Tours does not deny same and, indeed, has proffered evidence suggesting the class, as proposed by Plaintiffs, would include up to 283,000 travelers.  D. 360-4 at 4–5. Accordingly, the proposed class satisfies the numerosity requirement.

### 2.    Commonality

Plaintiffs also must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "To establish commonality under Rule 23(a)(2), one common question is enough." Savino v. Souza, 453 F. Supp. 3d 441, 450 (D. Mass. 2020) (citing Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 359 (2011)).  "A question is common if it is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" Parent/Professional Advocacy League v. City of Springfield, 934 F.3d 13, 28 (1st Cir. 2019) (quoting Wal-Mart, 564 U.S. at 350).  It is not critical whether common "questions" are raised; the decisive factor is "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Id. (quoting Wal-Mart, 564 U.S. at 350).  The commonality requirement is not to be conflated with the predominance criterion, which is "far more demanding."  In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008) (quoting Amchem Prods, Inc. v. Windsor, 521 U.S. 591, 624 (1997)).  The commonality requirement is, by comparison, a "low bar." Id. at 19; In re Celexa & Lexapro Mktg. & Sales Pracs. Litig., No. MDL 09-02067-NMG, 2014 WL 108197, at *6 (D. Mass. Jan. 10, 2014) (noting that commonality "is a 'low hurdle' that can be met with even a single common legal or factual issue").

Plaintiffs contend that there are common issues as to EF Tours' violation of Chapter 93A, causation and injury.  D. 362 at 11-19.  The Court concludes that Plaintiffs at least have satisfied

the low bar of the commonality requirement here as to injury (i.e., each class member received less than a full refund).  See Iannacchino v. Ford Motor Co., 451 Mass. 623, 630 n.12 (2008).

### 3.    Typicality

As to the typicality requirement, Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). "The representative plaintiff satisfies the typicality requirement when its injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff's claims and those of the class are based on the same legal theory."  In re Credit Suisse–AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008) (citation omitted).  Given that the SAC's class allegations center on a violation of § 15.06, D. 60 ¶¶ 70–77, and none of the class representatives are alleged to have "canceled first," id. ¶¶ 37, 45, 58, the Court is skeptical that their claims are typical of the claims of the now-broadened class, which appears premised on a more attenuated § 101 theory of Chapter 93A liability as discussed further below.  Nonetheless, because the class representatives, like all class members, agreed to the Booking Conditions, and because EF Tours does not challenge typicality, the Court will assume, without deciding, that Plaintiffs have shown typicality.  See Mongue v. Wheatleigh Corp., No. 3:18-cv-30095-KAR, 2021 WL 4459704, at *8 (D. Mass. Sept. 29, 2021).

### 4.    Adequacy

As to the adequacy of the class representatives, pursuant to Rule 23(a)(4), the Court considers whether "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This factor requires Plaintiffs to establish the absence of a potential conflict and an assurance of vigorous prosecution.  See Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).  "[P]erfect symmetry of interest is not required and not every discrepancy

among the interests of class members renders a putative class action untenable." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012). Rather, the inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem, 521 U.S. at 594, and focuses on conflicts that are "fundamental to the suit and that go to the heart of the litigation," Matamoros, 699 F.3d at 138 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)). "[S]peculative conflict should be disregarded at the class certification stage." Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 265 (D. Mass. 2008) (citation omitted). In addition, Plaintiffs must show that "counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation." Andrews, 780 F.2d at 130.

Although EF Tours appears to challenge the adequacy of Plaintiffs Sara Kahl and Thomas Akins, their arguments are raised in footnotes and too cursory to persuade the Court. See D. 361 at 31 nn.84–85; see Doherty v. Merck & Co., Inc., 892 F.3d 493, 500–01 (1st Cir. 2018) (noting that conclusory arguments raised only in footnotes are waived); Modeski v. Summit Retail Sols., Inc., 470 F. Supp. 3d 93, 110 (D. Mass. 2020) (same). Moreover, even assuming *arguendo* that these challenges had been properly raised, EF Tours does not challenge Plaintiff Melissa Douglas's adequacy and, thus, denial of class certification on the adequacy of all named Plaintiffs would not be warranted.

As for Plaintiffs' counsel, Defendants do not challenge their adequacy. Moreover, Plaintiffs' counsel's involvement in the litigation to date, which has included extensive briefing on a variety of motions, including dispositive motions, demonstrates their ability to vigorously prosecute this case. The Court also has considered the affidavits submitted by counsel, which detail their experience litigating similar actions. D. 353 ¶ 9; D. 354 ¶ 20. Accordingly, Plaintiffs

have satisfied adequacy under Rule 23(a)(4).  See Vargas v. Spirit Delivery & Distrib. Servs., 245 F. Supp. 3d 268, 288 (D. Mass. 2017).

    **D.**    **Rule 23(b)(3) Requirements**

        *1.*    *Superiority*

A putative class seeking certification under Rule 23(b)(3) also bears the burden of showing that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The Court considers four factors within this inquiry: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Id. The Court considers the alternatives to a class action, conscious that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Amchem, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997)) (internal quotation marks omitted).  This inquiry, thus, ensures that litigation by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Id. at 615 (citation omitted).

Here, with respect to the first factor, the individual interests in controlling the prosecution of separate actions over small amounts, ranging from $350 to $1,000, cede to the interests of the class. See Smilow, 323 F.3d at 41.  As to the second factor, the record offers little indication that individual class members are bringing similar actions on an individual basis.  With respect to this

particular forum, that EF ICE and EF America maintain their principal place of business in Massachusetts, D. 60 ¶¶ 8–9, and that Plaintiffs' only claim is brought pursuant to Chapter 93A, the Massachusetts consumer protection statute, underscore the desirability of Massachusetts as the appropriate forum.  Finally, there are no administrative difficulties sufficient to defeat class certification on superiority grounds, particularly in light of the efficiency of managing this case as a class action.  See Amchem, 521 U.S. at 615.  Thus, Plaintiffs have met the superiority requirement.

### 2.    *Predominance*

Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The focus of the predominance inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem, 521 U.S. at 623.  When conducting a Rule 23(b)(3) analysis, the Court must determine whether there is "reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate."  Halliburton Co. v. Erica P. John Fund Inc., 573 U.S. 258, 276 (2014).  This requires a district court to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case."  Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000).  It is, therefore, typical for the predominance inquiry to overlap with the merits inquiry.  See, e.g., New Motor Vehicles, 522 F.3d at 25; Celexa, 2014 WL 108197, at *7–9.

At class certification, merits questions may only be considered to the extent "they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).  "[W]hen a Rule 23

requirement relies on a novel or complex theory as to injury, as the predominance inquiry does in this case, the district court must engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed." New Motor Vehicles, 522 F.3d at 26. "The requirement that courts perform a 'searching inquiry' at the class certification stage serves an important function:  ensuring that class certification does not allow plaintiffs to unfairly bully defendants into settling 'non-meritorious cases in an effort to avoid both risk of liability and litigation expense.'" Credit Suisse-AOL, 253 F.R.D. at 22 (quoting New Motor Vehicles, 522 F.3d at 8).

Here, the parties dispute whether individual issues predominate with respect to Plaintiffs' Chapter 93A claim.  To prevail on their Chapter 93A claim, Plaintiffs will need to prove "(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury." Downing v. Keurig Green Mountain, Inc., No. 1:20-cv-11673-IT, 2021 WL 2403811, at *5 (D. Mass. June 11, 2021) (quoting Tomasella v. Nestlé, Inc., 962 F.3d 60, 71 (1st Cir. 2020)).

Plaintiffs attempt to satisfy the first element of their claim by asserting a *per se* violation of Chapter 93A.  See D. 362 at 11; McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 120 (1st Cir. 2014) (noting that "a so-called per se violation is not truly per se, as per se findings satisfy Chapter 93A's first prong only (i.e., that the conduct at issue is unfair or deceptive)").  Specifically, Plaintiffs argue that EF Tours' Booking Conditions purported to waive the rights of all class members in violation of Mass. Gen. L. c. 93, § 101 and that, under 940 C.M.R. § 3.16(3), a violation of § 101 is a *per se* violation of Chapter 93A.  See D. 362 at 11. Although "Massachusetts courts have recognized that violations of a limited number of statutes automatically give rise to liability under Chapter 93A," McDermott, 775 F.3d at 117, Plaintiffs

have not identified any cases holding that a § 101 violation is a violation of Chapter 93A.  Given the novelty of Plaintiffs' theory—without which Plaintiffs cannot establish that all class members have been cognizably injured—the Court considers its viability.  See New Motor Vehicles, 522 F.3d at 28–30 (vacating and remanding class certification for the district court to consider the merits of plaintiffs' novel theory of consumer injury in an antitrust and consumer protection class action); Celexa, 2014 WL 108197, at *8–9 (analyzing Illinois and New York case law, as part of a predominance analysis, to assess the viability of plaintiffs' novel theory of causation under consumer protection law).

As already noted, Plaintiffs' § 101 theory rests on the interplay between Chapter 93A and 940 C.M.R. § 3.16(3), "an Attorney General regulation declaring that a violation of a state statute providing for public health, safety, or welfare is itself a Chapter 93A violation."  McDermott, 775 F.3d at 118.  Plaintiffs contend that EF Tours is liable under Chapter 93A because their Booking Conditions violated § 101, a state statute barring the waiver of "[a]ny rights granted to consumers under the provisions of any law or regulation enacted or promulgated by the commonwealth."  In Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 171–76 (2013), however, the Massachusetts Supreme Judicial Court ("SJC") considered a similar argument by plaintiffs seeking to rely upon 940 C.M.R. § 3.16(3) to argue that defendants' knowing violations of the Massachusetts building code were *per se* violations of Chapter 93A.  The SJC held that 940 C.M.R. § 3.16(3) is "bound by the scope of [Chapter] 93A, § 2(a)," that is, "a violation of a law . . . will be a violation of [Chapter] 93A, § 2(a), only if the conduct leading to the violation is both unfair or deceptive and occurs in trade or commerce."  Id. at 174.

While Chapter 93A does not define what constitutes an "unfair or deceptive" practice, courts have defined "an act or practice [as] unfair if it falls 'within at least the penumbra of some

common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'" Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)). "[A]n act or practice is deceptive 'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" Id. (second alteration in original) (quoting Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 394 (2004)).

In light of Klairmont, the Plaintiffs cannot viably assert that a violation of § 101, without more, is a *per se* Chapter 93A violation by operation of 940 C.M.R. § 3.16(3).[5]  Plaintiffs also have not shown that EF Tours' Booking Conditions could have risen to the level of being unfair or deceptive within the meaning of Chapter 93A.  See Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 18 (1st Cir. 2021) (explaining that the caselaw "do[es] not diverge from the Chapter 93A principle that 'something more' [than negligence] and rising to the level of extreme or egregious conduct is required for a successful Chapter 93A claim").  Thus, determining any Chapter 93A violation would require individualized inquiries into the conduct of EF Tours and their representations to individual travelers or Group Leaders.  Because such individualized inquiries into EF Tours' comms logs for some 283,000 travelers would overwhelm common questions as to the first prong of Chapter 93A, Plaintiffs do not satisfy the predominance requirement.

---

[5] Although Klairmont forecloses a *per se* Chapter 93A violation based solely upon on a § 3.16(3) violation, that case did not prevent violations of other regulations promulgated by the Attorney General, interpreting the provisions of Chapter 93A, from serving as the basis of a *per se* Chapter 93A violation.  See Hebert v. Vantage Travel Serv., Inc., No. 17-cv-10922-DJC, 2021 WL 2516076, at *3 (D. Mass. June 18, 2021) (explaining that, although the SJC held in Klairmont that § 3.16 could not make every violation of same a *per se* Chapter 93A violation, violations of other regulations like 940 C.M.R. § 15.00 may constitute unfair or deceptive acts under Chapter 93A) and cases cited.

Assuming *arguendo* that Plaintiffs' § 101 theory is viable and that common issues predominate on the first prong of their Chapter 93A claim, individual issues still predominate with respect to causation as to this claim.  Plaintiffs argue that the SJC's decision in <u>Casavant v. Norwegian Cruise Line Ltd.</u>, 460 Mass. 500 (2011), established an "objective" test for causation under Chapter 93A.  D. 352 at 19–22.  According to Plaintiffs, under <u>Casavant</u>, the question is not whether the Booking Conditions actually caused injury to individual class members but whether same would have caused the "reasonable" traveler to not assert his or her right to a full refund under § 15.06 and, thus, receive only a partial refund.  See <u>id.</u>  Plaintiffs' discussion of <u>Casavant</u>, however, confuses the reasoning of the Massachusetts Appeals Court ("Appeals Court") and the SJC's decisions and overlooks the appropriate test for causation under Chapter 93A.

<u>Casavant v. Norwegian Cruise Line, Ltd.</u>, 76 Mass. App. Ct. 73, 74, 76 (2009), involved two travelers who had booked a trip with a cruise line but canceled it after the terrorist attacks on September 11, 2001.  The travelers then requested a refund, and the cruise line declined to issue one.  <u>Id.</u> at 76.  The travelers brought a Chapter 93A claim on the theory that the cruise line had failed to disclose the complete terms of its refund policy.  <u>Id.</u>  After concluding that the cruise line had violated 940 C.M.R. § 15.04, the Appeals Court noted that "[c]ausation is established if the deception could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted."  <u>Id.</u> at 77 (alteration in original) (internal quotation marks and citation omitted).  The Appeals Court held that causation was met because, had the cruise company timely disclosed the refund policy, the travelers would have acted differently; accordingly, the Appeals Court reversed a lower court's judgment in favor of the cruise line on the Chapter 93A claim.  <u>Id.</u> at 78–79.

On further appellate review, the SJC acknowledged the Appeals Court's reasoning as to causation and "reverse[d] the judgment on the [Chapter] 93A claim, but for reasons somewhat different from those of the Appeals Court."  See Casavant, 460 Mass. at 501.  The SJC explained that, to establish causation, the plaintiffs must show "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception."  Id. at 503 (citation omitted).  Applying this standard, the SJC noted that the terms of § 15.04 entitled the travelers to a refund and obligated the cruise line to issue one given its nondisclosure of a refund policy; the SJC, thus, held that the § 15.04 violations "caused the Casavants a loss:  the lack of a prompt refund of the ticket price"—without analysis of how the reasonable traveler would have acted.  Id. at 504.

Thus, under SJC precedent, the relevant question is not whether a "reasonable" traveler would have behaved differently but whether the plaintiff can show a causal connection between the deception and the loss and that the loss was foreseeable.[6]  See Heller Fin. v. Ins. Co. of N. Am., 410 Mass. 400, 409 (1991) (explaining that while a Chapter 93A plaintiff "need not show actual reliance on the misrepresentation, the evidence must warrant a finding that a causal relationship existed between the misrepresentation and the injury").  Put differently, "[a] plaintiff's failure to establish both factual causation and proximate causation is fatal to her Chapter 93A claim."  Walsh,

---

[6] Plaintiffs cite the SJC's decision in Aspinall, 442 Mass. at 395–97, in support of their argument that Chapter 93A causation is determined according to an "objective" test.  D. 352 at 19–21.  The SJC's reference to the "reasonable consumer" in Aspinall, 442 Mass. at 395–97, however, was part of its discussion of the "test for deception."  To the extent the court blended its analysis of deception and causation, this reflects the SJC's prior approach to Chapter 93A that a deceptive act could also establish a *per se* injury (thus rendering an independent causation analysis superfluous); the SJC has since "moved away" from such a "per se" concept of injury under Chapter 93A.  See Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 254–55 (1st Cir. 2010) (summarizing the SJC's modern Chapter 93A jurisprudence post-Aspinall and noting that, "[a]bsent explicit overruling, some tension remains in the language used as between the earlier and the later SJC decisions"); D. 363 at 4.

821 F.3d at 160; see Ferreira v. Sterling Jewelers, Inc., 130 F. Supp. 3d 471, 484 (D. Mass. 2015) (noting that "Chapter 93A requires proof of 'but for' causation and proximate causation").

Because each class member must show both factual causation and proximate causation, individual issues as to causation are bound to predominate.  There is ample reason in the record to doubt whether, but for the Booking Conditions, all class members, including but not limited to those who canceled their tours before EF Tours postponed or canceled same, would have acted differently.  For instance, some travelers canceled for a variety of reasons, some of which were related to the Covid-19 pandemic and some of which were not.  See D. 360-51 ¶¶ 18–20. Moreover, because various stakeholders, such as students, parents, Group Leaders or school districts had the ability to cancel tours, individual inquiries would be required to discern the causal connection between the Booking Conditions and a decision not to assert one's rights under § 15.06. See D. 362 at 5–6 (claiming that EF Tours' Chapter 93A violation began when its contracts first purported to deprive the class of its legal rights).  For at least these reasons, Plaintiffs also cannot satisfy the predominance requirement with respect to the proposed class because individual issues of causation would predominate.[7]  Accordingly, certification of the class would not be warranted under Rule 23(b)(3), even assuming *arguendo* that the introduction of  Plaintiffs' broadened class definition at this juncture was not unduly prejudicial to EF Tours.

**VI.    Conclusion**

For all of these reasons, the Court DENIES Plaintiffs' motion to certify the proposed class. D. 351.

**So Ordered.**

---

[7] Given the ruling above, the Court does not reach EF Tours' predominance challenge regarding individual issues of injury stemming from the meaning of "fair market retail value" under § 15.06.  See D. 361 at 27–32, 36–37; D. 362 at 18–20.

/s Denise J. Casper
United States District Judge