## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **MELISSA DOUGLAS et al.,** | ) | |
| **Plaintiffs** | ) | |
| **v.** | ) | **Case No. 20-cv-11740-DJC** |
| **EF INSTITUTE FOR CULTURAL EXCHANGE, INC., et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

CASPER, C.J.                                                    December 19, 2025

## I.    Introduction

Plaintiffs Melissa Douglas ("Douglas"), Thomas Aikins ("Aikins") and Sarah Kahl ("Kahl") (collectively, "Plaintiffs"), have filed this lawsuit against Defendants EF Institute for Cultural Exchange, Inc. ("EF Institute"), EF Education First International, Ltd. ("EF International") and EF Explore America, Inc. ("EF America") (collectively, "EF Tours"), alleging violations of Mass. Gen. L. c. 93A ("Chapter 93A").  D. 60.  Plaintiffs have now moved for summary judgment.  D. 387.  For the reasons stated below, the Court ALLOWS Plaintiffs' motion for summary judgment in part and DENIES it in part.  Id.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp.,

217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The Court draws the following facts from the parties' statements of undisputed facts and accompanying exhibits. D. 389; D. 389-1; D. 390; D. 394; D. 396; D. 398; D. 399; D. 403; D. 403-1. Unless otherwise noted, these facts are undisputed.

### A.    EF Tours

EF Tours markets and operates all-inclusive educational tours to historical and cultural sites, primarily for middle and high school students. D. 394 ¶ 1; D. 403-1 ¶ 1. EF Institute provides marketing services for international group tours and EF International operates those tours. D. 394 ¶ 2; D. 403-1 ¶ 2. EF America both markets and operates group tours to locations in the United States. D. 394 ¶ 3; D. 403-1 ¶ 3. EF Tours arranges all aspects of the tours, including air travel and accommodations. D. 394 ¶ 4; D. 403-1 ¶ 4.

### B.    Plaintiffs Enrolled Their Children in School Vacation Trips with EF Tours

Between October 2018 and September 2019, Douglas, Aikins and Kahl enrolled their children in school vacation tours with EF Tours. D. 389-1 ¶ 1; D. 394 ¶ 1; D. 403-1 ¶ 1. Plaintiffs' Account Statements show the date initial payments were made to EF Tours to enroll their children

in the trips.[1]  D. 389-1 ¶ 1; D. 390-1 at 2; D. 390-2 at 2; D. 390-3 at 2; D. 390-4 at 2; D. 394 ¶ 1; D. 403-1 ¶ 1.  On December 1, 2018, Douglas enrolled her daughter Brinley on a trip to Venice, the Alps and Paris, scheduled for April 4 to April 12, 2020, and paid EF Tours a total of $3,846.  D. 389-1 ¶ 2; D. 390-1 at 2-3; D. 394 ¶ 2; D. 403-1 ¶ 2.  On September 28, 2019, Aikins enrolled his daughter Papassorn on a trip to Italy scheduled to depart on April 17, 2020.[2]  D. 390-2 at 2; see D. 389-1 ¶ 4; D. 394 ¶¶ 4, 45; D. 403-1 ¶¶ 4, 45.  On April 25, 2019, Kahl enrolled her son Zackery and daughter Madeline on a trip to Washington D.C. and New York City, scheduled to depart on March 23, 2020, and paid EF Tours $2,278 for each trip for a total of $4,556.  D. 389-1 ¶ 3; D. 390-3 at 2; D. 390-4 at 2; D. 394 ¶¶ 3, 28; D. 403-1 ¶¶ 3, 28.

Each of the Plaintiffs agreed to certain Booking Conditions.  D. 394 ¶ 6; D. 403-1 ¶ 6.  The Booking Conditions state:  "I have made the choice to travel with the teacher/Group Leader organizing my group. I understand that this choice is not the responsibility of EF [and] understand that my Group Leader is able to make decisions on my behalf, including but not limited to changing the group's requested tour or travel date . . . If my Group Leader cancels for any reason, EF will ask him or her to assign a new Group Leader."  D. 394 ¶ 8; D. 396-1 at 7; D. 403-1 ¶ 8; see D. 390-28 at 5.

---

[1] Although EF Tours disputes that Aikins paid for his daughter Papassorn's trip because she reimbursed him for a portion of the total trip cost, see D. 396-2 at 5; D. 396-16 at 2; D. 394 ¶ 1; D. 403-1 ¶ 1, the Account Summary indicates that an initial payment was made to Papassorn's account on September 28, 2019.  See D. 390-2 at 2.

[2] The Court notes that the enrollment date was September 28, 2019, not September 28, 2018.  See D. 390-2 at 2.  The Account Summary indicates payments made to Papassorn's account totaled $3,515.  Id.

### C.    EF Tours Do Not Depart as Scheduled Due to the Pandemic

When COVID-19 first spread in January and February 2020, call volumes from concerned parents and Group Leaders to EF Tours slowly increased.  D. 394 ¶ 14; D. 403-1 ¶ 14.  During this time, EF Tours closely monitored the impact of COVID-19 on the safety and feasibility of international travel and closely tracked recommendations and travel advisories from the State Department, World Health Organization and CDC.  D. 394 ¶ 15; D. 403-1 ¶ 15.  Beginning in March 2020, governmental orders in the United States and abroad resulted in international and domestic travel bans and the suspension of travel.  D. 394 ¶ 16; D. 403-1 ¶ 16.  Following President Trump's March 11, 2020 announcement restricting international travel, EF Tours received calls from travelers and Group Leaders concerned about traveling due to fear of COVID-19, and many thousands cancelled their trip in advance of their departure dates.  D. 394 ¶ 17; D. 403-1 ¶ 17.  EF Tours monitored conditions and government guidance to determine feasibility of travel to particular destinations on a rolling basis and communicated those determinations to groups approximately 45 days before departure.  D. 394 ¶ 23; D. 403-1 ¶ 23.

EF Tours contacted Group Leaders via email noting that travel scheduled in March and April 2020 would be postponed due to the COVID-19 outbreak.[3]  D. 389-1 ¶ 6; D. 390-9 at 2; D. 394 ¶ 6; D. 403-1 ¶ 6.  EF Tours's communications occurred principally through a software that generates mass or "blast" emails and stores records showing every email that a traveler or Group Leader received, but not the actual emails themselves.   D. 394 ¶ 24; D. 403-1 ¶ 24.  Communication Logs ("Comm Logs") contain records of phone calls, texts and emails between individual travelers and Group Leaders exchanged with EF Tours customer service

---

[3] EF Tours disputes that this communication, purportedly sent on March 12, 2020, addressed tours "[i]n February and March" or established that all tours were being cancelled or postponed.  D. 394 ¶ 6; D. 403-1 ¶ 6.

representatives.  D. 394 ¶¶ 19-20; D. 403-1 ¶¶ 19-20.  Each interaction is recorded in free-flow text entries, with emails and text messages typically copied-and-pasted into Comm Logs and phone calls contemporaneously summarized by EF Tours staff.  D. 394 ¶ 20; D. 403-1 ¶ 20.  As reflected in Group Leader Comm Logs, sometimes customer service representatives conveyed postponements directly to Group Leaders.  D. 394 ¶ 25; D. 403-1 ¶ 25.

### D. Plaintiffs Communications with Group Leaders and EF Tours Regarding Alternative Options and Refunds

With respect to Plaintiffs' trips, and other trips scheduled to depart prior to April 30, 2020, EF Tours initially offered refunds in the amount of the trip purchase price, less $1,000 on international trips and less $750 on domestic trips.  D. 389-1 ¶ 46; D. 394 ¶ 46; D. 403-1 ¶ 46.  EF Tours then increased the refundable amount to the purchase price, less $565 for international trips and less $450 for domestic trips.  D. 389-1 ¶ 47; D. 394 ¶ 47; D. 403-1 ¶ 47.

#### 1. The Douglas Family

On November 30, 2018, Douglas enrolled her daughter on a tour of Venice, the Alps and Paris set to begin on April 4, 2020 with Group Leader Pamela Charles ("Group Leader Charles"). D. 394 ¶¶ 68-69; D. 403-1 ¶¶ 68-69.  On January 23, 2019, Group Leader Charles notified Douglas that another teacher, Jennifer Solloway ("Group Leader Solloway") would be taking over as Group Leader.  D. 394 ¶ 70; D. 403-1 ¶ 70.

On February 26, 2020, Group Leader Solloway emailed parents stating that, "there have been some new and relatively quickly developments regarding the Coronavirus in Italy (specifically northern Italy), as you all are probably well aware . . . I did speak to our Tour Coordinator and she reassured me that if we need to reroute to another location if Italy is unsafe at that time, then EF Tours will of course make that happen."  D. 394 ¶ 73; D. 403-1 ¶ 73.

On March 3, 2020, Group Leader Solloway emailed the parents, "[i]t is with a very heavy heart that I write this email to you all. I spoke with our Tour Coordinator at EF yesterday and it is looking like due to the current situation with the coronavirus and its increasing spread, our trip will be postponed until next spring break 2021." D. 394 ¶ 76; D. 403-1 ¶ 76.

On March 5, 2020, the Clark County School District told parents it was "cancelling all out-of-state and international student travel effective immediately and until further notice." D. 394 ¶ 78; D. 403-1 ¶ 78. The same day, Douglas sent a letter to EF Tours's general counsel regarding her daughter's trip to demand a full refund, noting that she had "received notification from their school advisor that EF Tours had cancelled the planned tour." D. 389-1 ¶ 16; D. 394 ¶¶ 16,79; D. 403-1 ¶¶ 16, 79. On March 6, 2020, an EF Tours coordinator emailed Group Leader Solloway stating that they were "aware of the indefinite restriction on travel, and we are looking into this further on our end and potential options going forward." D. 394 ¶ 80; D. 403-1 ¶ 80.

On March 10, 2020, an EF Tours coordinator contacted Group leader Solloway to indicate it had been unable to reach the Clark County School District and that she did not believe any "dialogue" was possible about keeping the tour date. D. 394 ¶ 81; D. 403-1 ¶ 81. The same day, EF Tours's general counsel responded to Douglas's letter, noting that "[w]hat EF has not done is cancel your child's tour," and offering a travel voucher for a portion of Douglas' purchase price that could be used within the current or following year on a different trip or transferred to a family member or another student. D. 389-1 ¶ 17; D. 394 ¶¶ 17, 82; D. 403-1 ¶¶ 17, 82.

On March 12, 2020, EF International notified Douglas that it was postponing all international tours in March and April due to the COVID-19 pandemic. D. 394 ¶ 84; D. 403-1 ¶ 84.

On June 4, Douglas received a refund of the amount paid less $565.  D. 389-1 ¶ 18; D. 390-1 at 3; D. 394 ¶ 18; D. 403-1 ¶ 18. [4]

### 2.    The Kahl Family

On March 1, 2020, Kahl emailed EF America regarding her children's trips.  D. 394 ¶ 31; D. 403-1 ¶ 31.  On March 4, 2020, Group Leader Jodi Goodman ("Group Leader Goodman") notified Kahl and the other parents that she was not going to travel on the trip and that another teacher, Sophie Seegmiller ("Group Leader Seegmiller") would be taking over as the group leader. D. 394 ¶ 32; D. 403-1 ¶ 32.  Kahl received communications from Group Leader Goodman and EF Tours regarding her children's trips and attended a meeting with Group Leader Goodman on March 5, 2020 to discuss the trip plans.  D. 389-1 ¶ 23; D. 390-38 at 4-5; D. 394 ¶ 23; D. 403-1 ¶ 23.  On March 10, 2020, Group Leader Goodman forwarded an email from EF America to Kahl and other parents indicating that the tour was still planning to depart as scheduled.  D. 394 ¶ 33; D. 403-1 ¶ 33.

On the afternoon of March 12, 2020, the Utah Superintendent of Public Instruction held a press conference announcing that the state was recommending that all school trips occurring within the next two weeks be cancelled.  D. 394 ¶ 34; D. 403-1 ¶ 34.  Later that day, the Head of School for Utah Virtual Academy emailed all families enrolled in the school, announcing that the school had decided to postpone all "face-to-face events" taking place within the next two weeks, which would include the EF America trip.  D. 394 ¶ 35; D. 403-1 ¶ 35.  Also the same day, Group Leader Seegmiller spoke with a representative of EF America, who discussed rescheduling the tour,

---

[4] EF Tours disputes that Douglas received a "partial refund" and contends she received "more than the fair market retail value of the tour at the time."    D. 394 ¶ 18; D. 403-1 ¶ 18.

including for a date in late 2020 or 2021.  D. 394 ¶ 36; D. 403-1 ¶ 36.  After the call, EF America sent Group Leader Seegmiller a suggested email to send to parents.  D. 394 ¶ 37; D. 403-1 ¶ 37.

On March 13, 2020, Kahl received an email from EF Tours informing her that her children's trip was postponed.  D. 389-1 ¶ 25; D. 390-30 at 2; D. 394 ¶¶ 25, 38; D. 403-1 ¶¶ 25, 38.  On March 17, 2020, Group Leader Seegmiller called EF America regarding "mov[ing] ahead with the week of September 13th and stated she was "flexible with the month of [S]eptember."  D. 394 ¶ 39; D. 403-1 ¶ 39.  Kahl emailed her travel insurer on March 22, 2020, noting that "[s]ince COVID 19 has turned our world upside down all students in the state of Utah have been told no trips out of state" and that her "kids are unable to attend the next tour that the school has planned in September."  D. 394 ¶¶ 40-41; D. 403-1 ¶¶ 40-41.

EF Tours's Comm Logs indicate that on March 27, 2020, Kahl called EF Tours to request a voucher and on the same day Kahl received two vouchers by email.  D. 389-1 ¶¶ 28-29; D. 394 ¶¶ 28-29; D. 403-1 ¶¶ 28-29.  On April 7, 2020, Kahl received emails from EF Tours confirming receipt of her requests.  D. 389-1 ¶ 30; D. 394 ¶ 30; D. 403-1 ¶ 30.  On April 10, 2020, she received emails from EF Tours "confirm[ing] that we have processed [Kahl's children's] cancellation from their tour" and noting "[a]ny related refunds will be processed within the next 6 weeks."  D. 389-1 ¶ 31; D. 390-36 at 2; D. 390-37 at 2; D. 394 ¶ 31; D. 403-1 ¶ 31.[5]  On June 4, 2020, Kahl received two checks from EF Tours for $1,828.00 each, for a total of $3,656, which was $900 less than Kahl paid for her children's trips. D. 389-1 ¶ 32; D. 390-3 at 2; D. 390-4 at 2;

---

[5] EF Tours disputes that it emailed Kahl "confirming that her children's tour was cancelled" and that April 10, 2020 represents the day cancellation occurred.  D. 394 ¶ 31; D. 403-1 ¶ 31.

D. 394 ¶ 32; D. 403-1 ¶ 32.[6]

### 3.    The Aikins Family

On February 13, 2020, an EF Tours coordinator made an appointment with Group Leader Tony Lucchese ("Group Leader Lucchese") to discuss "trip options."  D. 394 ¶ 46; D. 403-1 ¶ 46. On February 24, 2020, Group Leader Lucchese emailed the EF Tours coordinator stating that he had "several parents expressing concerns about the novel coronavirus after recently diagnosed cases in northern Italy."  D. 394 ¶ 47; D. 403-1 ¶ 47.  On March 2, 2020, Group Leader Lucchese called EF Tours and said that given the coronavirus, he needed to check with students and that he had an upcoming meeting with parents.  D. 394 ¶ 48; D. 403-1 ¶ 48.  On March 3, 2020, Aikins received an email from Group Leader Lucchese regarding the trip and a meeting scheduled on March 4, 2020.  D. 389-1 ¶ 33; D. 390-14 at 2; D. 394 ¶ 33; D. 403-1 ¶ 33.  Aikins was not in attendance at the meeting, during which five of the six participating parents selected a different destination for the tour.  D. 394 ¶ 50; D. 403-1 ¶ 50.

On March 5, 2020, Aikins received an email from Group Leader Lucchese regarding options provided by EF Tours, including traveling to a different country on the same dates, postponing the trip until summer, or receiving travel vouchers for future travel.  D. 389-1 ¶ 34; D. 390-15 at 2; D. 394 ¶ 34; D. 403-1 ¶ 34.[7]  Aikins noted he was "very upset" that EF Tours did not offer a full cash refund.  D. 394 ¶ 52; D. 403-1 ¶ 52.  The next day, on March 6, 2020, Aikins

---

[6] EF Tours disputes that the two checks from EF Tours represented "partial refunds on both trips" and contends EF Tours paid Kahl "more than the fair market retail value of the tour at the time."  D. 394 ¶ 32; D. 403-1 ¶ 32.

[7] EF Tours disputes that EF Tours had postponed Aikins' tour as of March 5, 2020.  D. 394 ¶ 34; D. 403-1 ¶ 34.

submitted a complaint with the Office of the Attorney General of Maine.  D. 389-1 ¶ 35; D. 390-39 at 5-6; D. 394 ¶¶ 35, 56; D. 403-1 ¶¶ 35, 56.

On March 9, the superintendent for the school district attended by Aikins' daughter stated that anyone who traveled abroad would need to quarantine and stay away from the school for two weeks upon their return.  D. 394 ¶ 60; D. 403-1 ¶ 60.  Group Leader Lucchese notified parents of this information and stated that he could not "afford to be away from school for two additional weeks."  D. 394 ¶ 61; D. 403-1 ¶ 61.

On March 10, 2020, Aikins contacted EF Tours regarding his refund amount.  D. 389-1 ¶ 36; D. 390-41 at 3; D. 394 ¶ 36; D. 403-1 ¶ 36.  On March 12, 2020, Aikins received an email from EF Tours informing him that his child's trip and all tours in March and April were postponed due to the pandemic.  D. 389-1 ¶ 37; D. 390-42 at 3-4; D. 394 ¶¶ 37, 66; D. 403-1 ¶¶ 37, 66.

On March 16, 2020, EF Tours's legal counsel sent Aikins a letter in response to his complaint.  D. 389-1 ¶ 35; D. 390-40 at 2-6; D. 394 ¶ 35; D. 403-1 ¶ 35.  The following day, on March 17, 2020, Aikins received an email from EF Tours with the options for travelers whose scheduled tours had been postponed.  D. 389-1 ¶ 38; D. 394 ¶ 38; D. 403-1 ¶ 38.  The email informed Aikins that he would receive a voucher for the full amount that could be used for a different trip, transferred to a family member or other student, or redeemed for a refund in the amount of the purchase price, less $1,000.  Id.

On March 19, 2020, an "FTV Cancellation Inquiry" was logged in Aikins's EF Tours Comm Log.  D. 389-1 ¶ 39; D. 394 ¶ 39; D. 403-1 ¶ 39.  EF Tours called Aikins, and he again objected to a withholding of $1,000 from his refund.  Id.  At that time, EF Tours again offered him three options:  "Cancel" the tour and receive a refund of the amount paid, less $1,000; accept a travel voucher for the cost of the tour, less the $95 non-refundable deposit, to be used on another

trip; or accept the travel voucher and try to sell it to another student participating in a tour in 2021. D. 389-1 ¶ 40; D. 394 ¶ 40; D. 403-1 ¶ 40.

On March 27, 2020, Aikins received a voucher from EF Tours by email.  D. 389-1 ¶ 41; D. 394 ¶ 41; D. 403-1 ¶ 41.  Aikins received an email on April 10, 2020 stating "[y]our cancellation is confirmed."  D. 389-1 ¶ 42; D. 394 ¶ 42; D. 403-1 ¶ 42.  On April 22, 2020, Aikins's EF Tours Comm Log reflected a "cancellation" and stated, "Cancellation date 2020-04-08."  D. 389-1 ¶ 43; D. 394 ¶ 43; D. 403-1 ¶ 43.  On May 7, 2020 and June 4, 2020, Aikins was issued refunds for the purchase price, less $565.  D. 389-1 ¶ 44; D. 390-2 at 2; D. 394 ¶ 44; D. 403-1 ¶ 44.[8]

## IV.    Procedural History

The original lead plaintiff instituted this action on March 17, 2020 in the U.S. District Court for the Southern District of California.  D. 1.  On May 15, 2020, Douglas and other plaintiffs filed the first amended complaint.  D. 12.  In September 2020, the case was transferred to this Court. D. 40; D. 41.  On December 7, 2020, Plaintiffs filed the operative, second amended complaint ("SAC").  D. 60.

EF Tours moved to dismiss the SAC under Fed. R. Civ. P. 12(b)(6), D. 75, and the Court denied the motion on September 22, 2021.  D. 94.  On November 10, 2021, EF Tours moved to certify questions regarding 940 C.M.R. § 15.06 ("Section 15.06") to the Massachusetts Supreme Judicial Court.  D. 108.  The Court denied the motion.  D. 147.  On December 15, 2021, Plaintiffs moved for leave to file a proposed third amended complaint, D. 121, seeking to amend the class definition, D. 121-1 ¶ 89, and add allegations claiming violations of 940 C.M.R. §§ 15.03 and 15.04, see D. 121 at 1; D. 121-1 ¶¶ 29, 30-32, 39-40, 91, 98.  The Court denied the motion because,

---

[8] EF Tours contends that Aikins received "more than the fair market retail value of the tour at the time."  D. 394 ¶ 44; D.403-1 ¶ 44.

among other reasons, the proposed class definition would have included many consumers who could not assert an injury under Section 15.06 and, thus, would have been overbroad and failed the ascertainability inquiry.  D. 148.

On July 27, 2022, EF Tours moved to dismiss the SAC for lack of standing and to strike class allegations.  D. 152.  The Court denied that motion.  D. 240.  Plaintiffs moved for class certification on March 6, 2024.  D. 351.  The Court denied the motion, concluding that class certification would be unduly prejudicial to EF Tours because the Plaintiffs' proposed class definition was broader than the class definition alleged in the SAC and broader with respect to the alleged scope of EF Tours's liability under Chapter 93A.  See D. 371 at 7-13.  The Court also concluded that even if it had accepted Plaintiffs' class definition, the class failed on the predominance requirement under Rule 23(b)(3) because individual issues regarding causation would predominate.  Id. at 24-26.

On July 10, 2024, Plaintiffs moved (with the assent of EF Tours) to stay the action pending the First Circuit's disposition of their petition for leave to appeal the Court's order, D. 371.  D. 373.  The Court allowed the motion, D. 374, and lifted the stay on December 13, 2024, D. 380, following the First Circuit's denial of Plaintiffs' petition for leave to appeal, D. 378; see D. 379.

On April 15, 2025, Plaintiffs moved for summary judgment.  D. 387.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 407, 408.

## V.    Discussion

Plaintiffs' claim against EF Tours under Mass. Gen. L. c. 93A is based on EF Tours's alleged violations of 940 C.M.R. § 15.06.  D. 60 ¶¶ 78-79.  "Although [Chapter 93A] does not define what acts and practices are unfair or deceptive, . . . [Chapter] 93A specifically authorizes the Attorney General to promulgate regulations making these determinations."  Casavant v.

12

Norwegian Cruise Line, Ltd., 76 Mass. App. Ct. 73, 76 (2009), aff'd, 460 Mass. 500, 503-04 (2011) (holding that "the [A]ttorney [G]eneral may make rules and regulations interpreting the provisions of [Chapter 93A]," like 940 C.M.R. § 15.00 *et seq.*, that "define[] and outlaw[] certain unfair or deceptive business practices in the sale of travel services to the public"); see McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 116 (1st Cir. 2014).

Section 15.01(1) states that a "[v]iolation of any provision of [940 C.M.R. § 15.00] shall be an unfair or deceptive act or practice, under [Mass. Gen. L. c. 93A], § 2(a)." 940 C.M.R. § 15.01(1). Relying upon Supreme Judicial Court precedent, the Court has previously held that when regulations define acts or practices as unfair or deceptive, "violations [of the Attorney General's Regulations] qualify as unfair or deceptive acts" as a matter of law. D. 240 at 3-4 (citing Casavant, 460 Mass. at 504); see D. 94 at 13-15 (same). The Court has also held that where regulations set out that an act or practice is *per se* unfair or deceptive, such as 940 C.M.R. § 15.01(1), Plaintiffs still must satisfy the causation and injury elements of the Chapter 93A claim. See D. 94 at 12; Barron v. NCMIC Ins. Co., No. 17-cv-11969-ADB, 2018 WL 2089357, at *5 (D. Mass. May 4, 2018) (explaining that "[v]iolations of state regulations that constitute *per se* unfair or deceptive practices under Chapter 93A do not, without more, establish injury under Chapter 93A"). Plaintiffs need not, however, make an additional showing of unfairness or deceptiveness by EF Tours aside from evidence of the violation itself. See D. 94 at 12-13; Cranmore v. Wells Fargo Bank, N.A., 410 F. Supp. 3d 336, 341-42 (D. Mass. 2019); see also D. 147.

**A.    There are Genuine Issues of Material Fact Regarding Whether EF Tours
Failed to Provide Two Plaintiffs with their Purchased Travel Services**

It is undisputed that EF Tours is a seller of travel services and a tour operator, as defined

in Section 15.02.  See 940 C.M.R. § 15.02; D. 394 ¶¶ 1-4; D. 403-1 ¶¶ 1-4.  Section 15.06 requires

that, where "a seller of travel services is acting as a tour operator, and the seller fails to provide

any of the travel services that a consumer has purchased directly or indirectly," the seller must

offer the consumer their choice of (1) "[a refund in] cash an amount equal to the fair market retail

value of any undelivered, purchased travel service"; or [(2)] specially identified substitution travel

service of equal or greater fair market retail value for any undelivered, purchased travel service, at

no additional cost to the consumer; or [(3)] specially identified substitute travel service of lower

fair market retail value for any undelivered, purchased travel service, and refund to the consumer

in cash an amount equal to the difference in the fair market retail prices of the purchased this

option."  940 C.M.R. § 15.06.

The term "fail" as used in Section 15.06 does not include a fault requirement.  See D. 147

(noting that "Title 940 repeatedly uses the term 'fail' to mean 'did not,' without incorporating an

element of fault, confirming that 'fail' used in Section 15.06 does not incorporate an element of

fault") (quoting Godines v. EF Explore America, Inc., No. 2184-cv-1327, 2021 WL 7083079, at

*10 (Mass. Super. Ct. Dec. 20, 2021)); Karila v. EF Educ. First Int'l, Ltd., No. 21-cv-10643-DJC,

2022 WL 623872, at *3 (D. Mass. March 3, 2022) (same).  Notably, Section 15.06 applies where

the travel service provider, in this case EF Tours, fails to provide the purchased travel services but

not where the consumer cancelled or rescheduled the same.  See Karila, 2022 WL 623872, at *3

(explaining a "reference to 'some failure on the part of the seller of travel services'" in an Attorney

General report regarding Section 15.06 "intended to distinguish between a tour cancellation driven

by the consumer's choice from one resulting, for whatever reason, by the failure of the tour

14

operator to deliver the trip") (quoting <u>Godines</u>, 2021 WL 7083079, at *11); <u>see</u> <u>also</u> D. 148 (concluding Plaintiffs' proposed amendment to class definition was futile where the proposed definition "would encompass all individuals whose tours 'did not depart' even if by choice of the consumer (e.g., tours cancelled by group leaders or schools) whereas Section 15.06 only applies where the travel service provider 'fails' to provide purchased travel services") (quoting 940 C.M.R. § 15.06); <u>see</u> <u>also</u> D. 371 at 14 (noting that "[b]ecause § 15.06 would not apply where a traveler or his or her Group Leader canceled a tour, the proposed class in the [proposed third amended complaint] would have included within the class many uninjured individuals and, therefore, been overbroad").

A key inquiry for the Court is whether Plaintiffs have demonstrated the absence of a genuine dispute of material fact that EF Tours failed to provide Plaintiffs with their purchased travel services by postponing or cancelling their trips. Plaintiffs argue that EF Tours failed to provide the travel services they purchased for the Spring of 2020 on specific dates and to specific destinations because EF Tours, not the Plaintiffs, cancelled or postponed the trips without providing a postponement date and for a period that ultimately lasted at least a year, effectively cancelling the trips. <u>See</u> D. 388-1 at 13-15; D. 402-1 at 9. EF Tours, however, asserts that there is a genuine dispute of material fact as to whether Plaintiffs, or their respective Group Leaders, cancelled or rescheduled their trips prior to EF Tours announcing the trips had been postponed. D. 395 at 13-16.

There is no dispute that the Plaintiffs agreed to certain Booking Conditions before enrolling their children on educational student tours with EF Tours. D. 403-1 ¶ 6; <u>see</u> D. 390-28 (domestic booking conditions); D. 396-1 (international booking conditions). These Booking Conditions constitute the operative contractual agreements between the Plaintiffs and EF Tours. <u>See</u> D. 390-

28 at 5 (stating that "[b]y signing the EF Release and Agreement, I understand and agree to the following"); D. 396-1 at 7 (stating that enrollee or his/her parent or legal guardian "have read, understand and agree to the following"). Here, neither party argues that the terms and provisions of the Booking conditions are ambiguous, but they disagree as to the Group Leader's ability to reschedule tours on the Plaintiffs' behalf, see D. 388-1 at 7-8, 13-15; D. 395 at 16-18; D. 402-1 at 12-13, and whether EF Tours cancelled or postponed their trips instead.

In concluding that Plaintiffs had Article III standing, the Court previously considered the Booking Conditions governing international and domestic trips and noted that they "do not necessarily support the inference that Plaintiffs agreed that the Group Leaders could unilaterally reschedule the tours to the following year." D. 240 at 5. Specifically, the Court quoted the "GROUP TRAVEL" provisions in the Booking Conditions ("Group Travel provisions"). Id.; see D. 390-28 at 2; D. 396-1 at 2. The Booking Conditions governing international travel state under "How does group travel work?" that "EF strives to keep departure dates within two days of the requested date for tours departing October through April and within four days of the requested date for tours departing May through September. Your final tour itinerary and travel dates will be confirmed approximately two months prior to departure." D. 396-1 at 2. The Booking Conditions governing domestic travel state under "Can my itinerary change" that "EF makes every effort to ensure that the new departure date will be within one to two days of the requested dates . . . In rare cases, it may be necessary to move dates by up to three days within the requested departure." D. 390-28 at 2. The Court stated that "[t]his language suggests that the contracts contemplated that any unilateral change to travel dates would be no more than a few days within a departure date," D. 240 at 5, and that "there [was] at least some suggestion [in the record] that EF Tours, not any Group Leaders or the Plaintiffs, canceled or postponed the tours," id. at 6. At a later juncture, the

Court denied Plaintiffs' motion for class certification upon concluding that the class failed on the predominance requirement because "determining any Chapter 93A violation would require individualized inquiries into the conduct of EF Tours and their representations to individual travelers or Group Leaders." D. 371 at 23. The Court noted that "there [was] ample reason in the record to doubt whether, but for the Booking Conditions, all class members, including but not limited to those who canceled their tours before EF Tours postponed or canceled same, would have acted differently," and that "because various stakeholders, such as students, parents, Group Leaders or school districts had the ability to cancel tours, individual inquiries would be required to discern the causal connection between the Booking Conditions and a decision not to assert one's rights under § 15.06." Id. at 26. Here, the individual inquiries show that there are some genuine issues of material fact as to two of the Plaintiffs (Douglas and Aikins) regarding whether EF Tours postponed or cancelled the trips for these three plaintiffs.

a)      EF Failed to Provide Kahl with her Purchased Travel Services

As Rebecca Otley ("Otley"), former EF Institute Manager of Travel Support, attests in her declaration, "Comm logs are the key source of information about any given traveler or Group Leader" because "traveler and Group Leader decisions about tours are documented in the comm logs." D. 360-51 ¶¶ 9-10. Here, there is no genuine issue of material fact regarding the timeline of communications between Kahl, the Kahl trip Group Leaders and EF Tours. The uncontroverted evidence in the record shows that EF Tours cancelled Kahl's children's trip before Kahl requested a full refund and consequently failed to provide her with her purchased travel services pursuant to 940 C.M.R. § 15.06.

It is undisputed that on March 1, 2020, Kahl emailed EF Tours regarding her children's trips. See D. 394 ¶¶ 19, 31; D. 403-1 ¶¶ 19, 31; see D. 390-27 at 4; D. 396-7 at 3. In her email, Kahl

17

stated, "I need to know if we can cancel this tour for our students[;] we have Madeline and Zackery that were scheduled for this, but since we might have a global pandemic we don't feel this is a safe time for our kids to travel. Can you please let me know if we can get our money back?"  D. 390-27 at 4; D. 396-7 at 3.  Because Kahl stated, "we don't feel this is a safe time for our kids to travel," EF Tours contends Kahl "evidenced a decision to cancel the trip prior to EF America postponing it."  D. 395 at 14.  Even assuming *arguendo* that at that point Kahl no longer intended to send her children on the trip, the entry in the Comm Logs between Kahl and EF Tours shows that Kahl requested information regarding whether she could cancel and the potential financial implications of that decision, and even EF Tours at that time construed Kahl's email only as a "Cancellation Inquiry" rather than a cancellation.  See D. 390-27 at 4.  Nothing in the record indicates that EF Tours interpreted Kahl's March 1, 2020 email as a cancellation or relied upon it to process a cancellation.  Instead, the undisputed evidence here indicates that it was on March 27, 2020 that Kahl called EF Tours to request a voucher and at that time EF Tours "caxed" and "issued [the] voucher," D. 394 ¶ 28; D. 403-1 ¶ 28; D. 390-27 at 2; D. 390-32 at 2-3; D. 390-33 at 2-3, and that on April 10, 2020 Kahl received emails from EF America that "confirm[ed] that [EF America] ha[d] processed [Kahl's children's] cancellation from their tour."  D. 390-36 at 2; D. 390-37 at 2.

The Comm Logs between Group Leader Seegmiller and EF Tours show that on March 12, 2020, at 12:56 p.m. EST, an EF Tours coordinator, Rachel Damian ("Damian"), "call[ed] out" to Group Leader Seegmiller and "[l]et  her know that we will not be sending her travelers to DC NYC."  D. 390-17 at 2; D. 396-10 at 2.  The entry notes state that Group Leader Seegmiller was "going to let [the EF Tours coordinator] know whether or not they will be moving to next year or if they want travel vouchers."  D. 390-17 at 2; D. 396-10 at 2.  A second Call Log entry at 1:08 p.m. EST between Group Leader Seegmiller and Damian similarly indicates that Damian "let

[Group Leader Seegmiller] know what her options are . . . she was asking about refund process but let her know we can either move her dates to late in 2020 or 2021 . . . also let her know we can do travel vouchers for her group . . . she is going to meet with her parents but will let them know what the options are going to be." D. 390-17 at 2; D. 396-10 at 2. A subsequent email from Damian to Group Leader Seegmiller included "an email template for [Group Leader Seegmiller] to send out to the families," which stated that "[b]ased on the unprecedented recent decisions made by the US Department of State to restrict travel to the US from Europe and additional precautions that our communities are taking, EF has decided to enact their Peace of Mind program and cancel all travel within North America (which includes Puerto Rico and Canada) until April 12th." D. 390-29 at 2. Although the Court must draw reasonable inferences in favor of EF Tours as the nonmovant, Noonan, 556 F.3d at 25, the Comm Logs entries indicate that on March 12, 2020, EF Tours contacted Group Leader Seegmiller and indicated that they would "not be sending her travelers," D. 390-17 at 2; D. 396-10 at 2, on their scheduled trip. Here, the evidence in the record shows that EF Tours confirmed to Group Leader Seegmiller that at that time it would not be providing the travel services purchased, see 940 C.M.R. § 15.06, and there is no dispute that EF Tours did not operate any student tours from March 12, 2020 through at least the end of 2020 (with the possible exception of Costa Rica), see D. 403-1 ¶ 14; see D. 390-23 at 3-4. EF Tours acknowledges that "EF notified Kahl's group leader on March 12, 2020 that the tour would not be departing as scheduled," see D. 403-1 ¶ 12, and to the extent that EF Tours raises a dispute, it does so only on the basis that on March 1, 2020 "Kahl had already decided that her two children would not be going on the tour," id., and not that these communications do not constitute a postponement or cancellation on behalf of EF Tours. As the Court explained above, no reasonable jury, on this record, could conclude that Kahl's March 1, 2020 email to EF Tours constituted a cancellation.

19

EF Tours's counsel argued at the motion hearing that the Call Logs did not indicate who requested to postpone the trip and that the present record is muddled and undeveloped regarding whether the Utah Superintendent or the Head of Kahl's children's school cancelled first.  See D. 408 at 20-21; see D. 395 at 14.  The Court concludes, however, that there is uncontroverted evidence in the record to determine that Plaintiffs have met their burden of demonstrating that EF Tours cancelled Kahl's children's tour prior to any communications from the Utah Superintendent or the Head of School for Utah Virtual Academy.  On March 12, 2020 at 11:12 a.m. MST (1:12 p.m. EST), Group Leader Goodman emailed her travelers and stated, "[w]ell, we got some bittersweet news.  They've officially cancelled the trip due to the Coronavirus."  D. 390-19 at 2; see D. 408 at 11.  The uncontroverted record shows this correspondence preceded the Utah Superintendent's recommendation to cancel out-of-state trips for two weeks because, as attested by Kahl in her deposition, the Superintendent held a press conference on March 12, 2020 between 2:00 p.m. and 4:00 p.m. MST (4:00 p.m. to 6:00 p.m. EST) during which that recommendation was made.  See D. 396-3 at 6 (99:20-25; 100:2-6).  The record indicates that Damian's email to Group Leader Seegmiller containing a template to send to travelers and their families and noting that "EF has decided to enact their Peace of Mind program and cancel all travel . . . until April 12th" was sent at 1:48 p.m. MST (3:48 p.m. EST), which was also prior to the superintendent's press conference.  See D. 390-16 at 2.  Similarly, the evidence in the record shows that the email from the Head of School for Utah Virtual Academy to families regarding the Utah Superintendent's recommendations, including "[c]ancellation of all school-related out-of-state travel for the next two weeks," and noting that the school would "only postpone face to face event scheduled within the next two weeks" was sent at 5:26 p.m. MST (7:26 p.m. EST).  D. 396-9 at 2. Thus, the uncontroverted timeline of all these communications on March 12, 2020 indicates that

neither the Utah Superintendent nor the Head of School for Utah Virtual Academy cancelled Kahl's children's tour prior to EF Tours's cancellation.

Accordingly, EF Tours failed to provide Kahl with the travel services she purchased for her children for a trip to Washington D.C. and New York scheduled to depart on March 23, 2020. See 940 C.M.R. 15.06.

<blockquote>

a)    <u>There is a Genuine Dispute of Material Fact as to Whether EF Tours Failed to Provide Douglas with her Purchased Travel Services</u>
</blockquote>

With respect to Douglas, there remain disputes of material fact regarding whether Group Leader Solloway rescheduled the trip on behalf of the entire group and Douglas cancelled her daughter's trip prior to a cancellation by EF Tours.  The Comm Logs between Group Leader Solloway and the EF Tours coordinator, Sonya Stephen ("Stephen"), show their communications beginning on February 26, 2020.  See D. 390-11 at 4.  Group Leader Solloway received a call from Stephen, who noted Group Leader Solloway was "[c]oncerned about coronavirus but she was reassured."  Id.  Stephen also noted that she told Group Leader Solloway that "if this situation in [I]taly persists we will change/modify her tour/talk options."  Id.  The same day, Group Leader Solloway emailed travelers regarding her conversation with Stephen and stated that "she reassured me that if we need to reroute to another location if Italy is unsafe at that time, then EF Tours will of course make that happen."  D. 396-19 at 2.  Evidence in the record shows that on February 28, 2020, Stephen emailed Group Leader Solloway stating, "[j]ust a quick message because you may be aware that the situation in Italy is quickly changing. I will be in contact with you on Monday [March 2, 2020] to talk about making changes to your trip."  D. 390-12 at 2.  The Comm Logs entry that day indicates that Group Leader Solloway again received a call from Stephen at 5:12 p.m. MST (7:12 p.m. EST) during which Stephen noted that she "[g]ave her the options for

changing her tour." D. 390-11 at 4. Stephen also noted that it "[s]ounds like she wants to postpone but going to reach out to travelers to see what everyone thinks." Id. The following day, on March 3, 2020, Group Leader Solloway sent an email at 7:01 a.m. EST to travelers in which she stated, "[i]t is with a very heavy heart that I write this email to you. I spoke with our Tour Coordinator at EF yesterday and it is looking like due to the current situation with the coronavirus and its increasing spread, our trip will be postponed until next spring break 2021." D. 390-10 at 2. A Comm Logs entry between Group Leader Solloway and Stephen later that day at 3:40 p.m. EST noted, "[m]ore questions. Looks like they will probably transfer trip to spring 2021." D. 390-11 at 3. After Group Leader Solloway's call with the EF Tours coordinator, she emailed Douglas to provide her with the options provided by EF Tours and expressed "how sorry I am that our trip can't happen." D. 396-20 at 3. In a response to Douglas on March 5, 2020, Group Leader Solloway stated, "I completely understand your frustration as it not being treated as a 'cancellation' when there is no way possible for us to go on our planned trip. EF has told me as well that it is not a cancellation since we're postponing it until next year, still for anyone who cannot go next year, that doesn't seem fair at all." Id. at 2.

These communications between Group Leader Solloway, EF Tours and travelers/parents present a genuine dispute of material fact as to whether EF Tours communicated first that the trip to Italy as scheduled was not an option given the pandemic and was postponed, or whether Group Leader Solloway preemptively changed the tour given the updates provided by Stephen and pursuant to the "Peace of Mind" program. See D. 390-8 at 2 (noting that "the U.S. Department of State issued a Level 3 Travel Advisory (Reconsider Travel) for all of Italy and a Level 4 Travel Advisory (Do Not Travel) for Northern Italy on February 28, 2020. In response, EF immediately reached out to your child's Group Leader to discuss a number of options to modify, re-book, and

delay the tour as necessary given the implications of this Travel Advisory for the health, safety, and well-being of travelers").  Pursuant to the "Peace of Mind Program" provisions in the international travel Booking Conditions, Group Leaders were authorized to change their current tour's travel dates or tour "at the group level for any reason, including terrorism or other world events" within less than forty-four days prior to departure only "if any location(s) included in the group's itinerary is designated as a Travel Advisory Level 3 or 4 by the U.S. Department of State." See D. 396-1 at 6.  While there is no dispute that no EF Tours student trips ultimately departed between March 12, 2020 and the end of 2020 (with the possible exception of Costa Rica), see D. 403-1 ¶ 14; see D. 390-23 at 3-4, EF Tours argued during the motion hearing that "EF has had tours that have gone on despite level 3 or level 4 State Department advisories," see D. 408 at 18, so the issuance of travel advisory did not automatically constitute a cancellation on their behalf at that time.

EF Tours also relies upon evidence in the record that suggests the superintendent of Douglas's daughter's school and Douglas took actions to cancel the trip on March 5, 2020 prior to EF Tours's March 12, 2020 email regarding the postponement of all tours in March and April, see D. 390-21 at 2.  See D. 395 at 15.  On March 5, 2020, the Clark County School District Superintendent announced the cancellation of "all out-of-state and international student travel effective immediately and until further notice."  D. 396-21 at 2; D. 403-1 ¶ 78.  The same day, Douglas requested a full refund of her trip from EF Tours through her legal counsel noting that she had "received notification from their school advisor that EF Tours had canceled the planned tour."  D. 403-1 ¶ 79; D. 390-26 at 2.  To the extent it is disputed whether Group Leader Solloway or EF Tours cancelled on March 3, 2020, it is also disputed whether the Superintendent's cancellation of international student travel and Douglas's request for a full refund on March 5,

2020 constituted an effective cancellation prior to EF Tours's postponement communication on March 12, 2020. Accordingly, the Court concludes there is a genuine dispute of material fact as to whether EF Tours failed to provide Douglas's purchased travel services.

a)    <u>There is a Genuine Dispute of Material Fact as to Whether EF Tours Failed to Provide Aikins with his Purchased Travel Services</u>

As to Aikins, there are genuine disputes of material fact regarding whether Group Leader Lucchese rescheduled the trip before EF Tours cancelled the trip. As reflected in the Comm Logs between Group Leader Lucchese and the EF Tours coordinator, Kirsten Cusack ("Cusack"), it is undisputed that on March 2, 2020, Group Leader Lucchese called EF International and said that given the pandemic, he needed to check with his students and had an upcoming meeting with parents. D. 403-1 ¶ 48; <u>see</u> D. 390-13 at 2. The next day, on March 3, 2020, Group Leader Lucchese emailed Aikins, travelers and other parents/legal guardians regarding "coronavirus updates." D. 390-14 at 2. Group Leader Lucchese stated, "[n]o doubt you are aware that the State Department recently increased the designated threat level for Italy from Level 2 to Level 3, which means as of right now, we are NOT going to Rome. . . . we will now be discussing our tour options instead." <u>Id.</u> This communication from Group Leader Lucchese does not provide clarity as to who determined the group would not be traveling to Rome, and the undisputed evidence in the record is insufficient to demonstrate that EF Tours postponed or cancelled the trip to Rome on March 3, 2020. There is a genuine dispute of material fact regarding whether it was Group Leader Lucchese's decision to exercise the option of changing the tour's travel dates or tour pursuant to the Peace of Mind Program provisions in the international Booking Conditions in light of the State Department travel advisories and before any postponement announcement by EF Tours. <u>See</u> D. 396-1 at 6. For instance, evidence in the record indicates that Group Leader Lucchese held a meeting with parents on March 4, 2020, <u>see</u> D. 403-1 ¶ 49; D. 390-13 at 2, and the Comm Logs

24

entry between Group Leader Lucchese and Cusack on March 5, 2020 states, "met w 5/6 families In [sic] narrowed down another country for travel dates/ couple for voucher GREECE, FRANCE (4 familys) [sic] need to request modified itinerary."  D. 390-13 at 2; see D. 390-15 (reminding parents by Group Leader Lucchese in a March 5, 2020 email that "we were given three options"). These communications suggest that Group Leader Lucchese discussed alternatives with the travelers' families, selected two destinations as alternative trip locations and communicated those proposed changes to their EF Tour coordinator, see D. 396-14 at 2; D. 396-15 at 2-3; D. 390-13 at 2, prior to EF Tours's postponement communication on March 12, 2020, see D. 403-1 ¶ 66; D. 390-42 at 2.

Further, on March 9, 2020, Group Leader Lucchese emailed Aikins, travelers and other parents/legal guardians noting that he spoke with the school district superintendent who "said that while the decision to travel abroad right now lies with you the parents, the decision to quarantine lies with him" and if the group chose to travel internationally he would implement a two-week quarantine on the travelers and Group Leader Lucchese.  D. 396-16 at 4; see D. 403-1 ¶¶ 60-61. Group Leader Lucchese noted he could not "afford to be away from school for two additional weeks," suggested the group accept the travel voucher option and stated that he intended to confirm that choice with the EF Tours coordinator by the end of the school day.  D. 396-16 at 4.  EF Tours accordingly contends that Group Leader Lucchese chose to cancel the tour based on the superintendent's instruction and that Aikins testified in his deposition that his understanding was that Group Leader Lucchese "cancelled the tour as re-routed to Greece" on March 9, 2020.  See D. 408 at 19; D. 396-2 at 4 (100:17-22).  Thus, on this record, the Plaintiffs have not shown that EF Tours cancelled or postponed Aikins's daughter's tour prior to Group Leader Lucchese's cancellation following the superintendent's recommendation.

**B.** **There is a Genuine Issue of Material Fact Regarding Whether EF Tours Failed to Offer Plaintiffs Cash Refunds Equal to the Fair Market Retail Value Pursuant to 940 C.M.R. § 15.06**

Section 15.06, in relevant part, requires the seller to offer the consumer three choices, one of which is "[a refund in] cash an amount equal to the fair market retail value of any undelivered, purchased travel service." 940 C.M.R. § 15.06. Plaintiffs contend that they are "entitled to the amounts they paid, less the fair market value of the services *they received*," D. 388-1 at 19 (emphasis in original), and note that "[t]he fundamental choice made in Section 15.06 is whether a consumer or the tour operator bears the cost of a cancelled tour" and "the regulation puts the burden of that cost on the tour operator," D. 402-1 at 10 (citing Godines, 2021 WL 7085170, at *11). EF Tours, however, argues that Plaintiffs misconstrue Section 15.06 to mean they are owed the full amount they paid.

Here, EF Tours has presented a genuine dispute of material fact regarding the amount of money that would constitute a fair market retail value of Plaintiffs' purchased travel services. Plaintiffs misconstrue the "general methodology of [p]laintiffs' expert" in Herbert v. Vantage Travel Servs., Inc., No. 17-cv-10922, 2021 WL 4392062, at *6 (D. Mass. Sept. 24, 2021), which entailed deducting "the fair market value of the delivered travel service from the fair market retail value of the purchased travel services," id., and assert that "no such calculation [of fair market retail value] is required, because EF [Tours] provided *no services*," D. 388-1 at 19 (emphasis in original). EF Tours's uncontroverted expert declaration from Bruce Deal ("Deal") suggests that fair market value does not mean the price paid for the tour, D. 396-25 ¶¶ 13, 19, and instead "it is the value of the undelivered travel services no sooner than the point when travelers were faced with a choice because their educational tour program could not depart as originally scheduled," id. ¶ 17. Deal further attests that "during the stricter travel restriction stages of the pandemic, there

were significant questions whether, at the time Plaintiffs allege that Defendant EF cancelled or postponed their tours, there was a functioning marketplace. The economic implication of using a market approach in such a circumstance would result in an extremely low 'market price' such that there is reason to question whether tours had any retail market value at all." Id. ¶ 18. Deal concludes that, "[a]ssuming there was a functioning marketplace at the time, there is a substantial question whether at the time [Plaintiffs'] tours were postponed, the retail market value of the three Plaintiffs' tours was even close to the amount they had paid for the tours back before the pandemic. Put another way, the amounts the Defendant EF offered in refunds to these three plaintiffs were likely considerably more than the fair market retail value of the tours at the time, given the prevalence of COVID." Id. ¶ 19.

Because Plaintiffs have not demonstrated that EF Tours's refunds, as provided initially or thereafter, are not equivalent to fair market retail value of the undelivered purchased travel services and EF Tours has adduced evidence suggesting the contrary, the Court considers the record in the light most favorable to EF Tours as the non-movant and concludes that there is a genuine dispute of material fact as to this issue. Accordingly, summary judgment at this juncture is not warranted as to this issue as to any of the Plaintiffs and the Court denies Plaintiffs' motion for summary judgment, D. 387, as to this issue. [9]

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Plaintiffs' motion for summary judgment, D. 387, in part and DENIES it in part.

**So Ordered.**

---

[9] In light of the Court's denial of the Plaintiffs' motion for summary judgment in this respect, D. 387, the Court does not reach Plaintiffs' request for multiple damages based on EF Tours's alleged knowing and willful violations of Chapter 93A and misrepresentation of their rights, see D. 388-1 at 20-21.

_/s Denise J. Casper_
Chief United States District Judge